# EXHIBIT "C"

 Neutral

As of: February 8, 2024 7:32 PM Z

## *Gurevitch v. Keycorp*

United States District Court for the Northern District of Ohio, Eastern Division

December 26, 2023, Decided; December 26, 2023, Filed

CASE NO. 1:23 CV 01520

**Reporter**

2023 U.S. Dist. LEXIS 228988 *; 2023 WL 8890938

MENACHEM GUREVITCH, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. KEYCORP, et al., Defendants.

**Subsequent History:** Stay denied by, Motion denied by *Gurevitch v. Keycorp, 2024 U.S. Dist. LEXIS 14828 (N.D. Ohio, Jan. 29, 2024)*

## Core Terms

Movant, lead plaintiff, appointment, trading, coordinate, motions, losses, shares, class period, transferred, Liaison, stock, discovery, rebutted, notice, proposed class, Plaintiffs', in-and-out, liquidity, pleadings, Defendants', adequacy, distractions, calculation, defenses, deposit, factors, filings, largest, funds

**Counsel: [*1]** For Menachem Gurevitch, Individually and on Behalf of All Others Similarly Situated, Plaintiff: Jeremy A. Lieberman, Joseph Alexander Hood, II, Pomerantz - New York, New York, NY; Robert J. Wagoner, Dittmer, Wagoner & Steele, Gahanna, OH.

For Richard Thompson, Plaintiff: Patrick G. Warner, LEAD ATTORNEY, Willis Spangler Starling - Hilliard, Hilliard, OH; Benjamin I. Sachs-Michaels, Glancy Prongay & Murray - New York, New York, NY; Charles H. Linehan, Robert V. Prongay, Glancy Prongay & Murray - Los Angeles, Los Angeles, CA.

For Thomas Marcotte, Plaintiff: Jeremy A. Lieberman, Joseph Alexander Hood, II, PRO HAC VICE, Pomerantz - New York, New York, NY; Robert J. Wagoner, Dittmer, Wagoner & Steele, Gahanna, OH.

For Robert J. Titmas, Plaintiff: James R. Cummins, Cummins Law, Cincinnati, OH; Morgan M. Embleton, Levi & Korsinsky - Stamford, Stamford, CT.

For KeyCorp, Christopher M. Gorman, Beth E. Mooney, Clark H.I. Khayat, Donald R. Kimble, Defendants: Geoffrey J. Ritts, Henry C. Hassay, Jones Day - Cleveland, Cleveland, OH.

**Judges:** DONALD C. NUGENT, United States District Judge.

**Opinion by:** DONALD C. NUGENT

## Opinion

### MEMORANDUM OF OPINION REGARDING APPOINTMENT OF LEAD PLAINTIFF AND APPROVAL OF SELECTION OF COUNSEL

The matter **[*2]** is before the Court on competing motions for appointment as lead plaintiff with respect to a proposed class action complaint, specifically: (1) *Motion of Robert J. Titmas for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #18); and (2) *Motion of Richard Thompson for Appointment as Lead Plaintiff and Approval of Counsel* (ECF #19).[1] The motions are fully briefed and ready for ruling by the Court.

On November 28, 2023, the Court heard oral argument in open court on the competing motions. (*See* ECF #24, *Order of 10/23/2023* & ECF #31, *Minutes of Proceedings 11/28/2023*).

For the reasons stated below, the Court appoints Robert J. Titmas as Lead Plaintiff and approves the law firm of Levi & Korsinsky, LLP to serve as Lead Counsel and the law firm of Cummins Law LLC to serve as Liaison Counsel.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

---

[1] There was initially a third motion, *Motion of Thomas Marcotte for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #20). That motion was effectively withdrawn with the filing of *Notice of Non-Opposition of Thomas Marcotte to Competing Motions for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #21).

ADAM APTON

### *The Proposed Class Action Complaint*

The following facts are drawn from the proposed *Class Action Complaint* (ECF **[*3]** #1) ("*Complaint*") and the pleadings related to the motions for appointment of counsel. They are accepted as true only for the purpose of deciding the competing motions for appointment as lead plaintiff and approval of selected lead and liaison counsel.

The *Complaint* asserts that "[t]his is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants [who] purchased or otherwise acquired [KeyCorp] securities between February 27, 2020 and June 9, 2023, . . . seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and *Rule 10b-5* promulgated thereunder, against [KeyCorp] and certain of its top officials." (ECF #1, ¶ 1) (inserts supplied for clarity).

Plaintiff Menachem Gurevitch is an investor who purchased 1,000 shares of KeyCorp securities in June 2020. (ECF #1, ¶ 16 & ECF #1-1).

Defendant KeyCorp is an Ohio corporation with its principal executive offices located in Cleveland, Ohio. (ECF #1, ¶ 5). KeyCorp's common shares trade on the New York Stock Exchange under the ticker symbol "KEY." (ECF #1, ¶ 5). KeyCorp operates as a holding company for KeyBank National Association, **[*4]** which provides various retail and commercial banking products and services in the United States. (ECF #1, ¶ 2). One of KeyCorp's principal sources of revenue is something called "net interest income" ("NII"), which is calculated as the difference between interest income received on earnings assets (such as loans and securities) and loan-related fee income, and the interest expense paid on deposits and borrowings. (ECF #1, ¶ 2).

Other named Defendants are: (1) Christopher M. Gorman, who has served as KeyCorp's Chairman and Chief Executive Officer since May 1, 2020, and before which he served as KeyCorp's Chief Operating Officer, (ECF #1, ¶ 18); Gorman has also served as KeyCorp's President throughout the time pertinent to the Complaint, (ECF #1, ¶ 18); (2) Beth E. Mooney, who served as KeyCorp's Chairman and CEO from prior to February 2020 to May 1, 2020, (ECF #1, ¶ 19); (3) Clark H.I. Khayat, who served as KeyCorp's Chief Financial Officer since March 16, 2023, (ECF #1, ¶ 20); and (4) Donald R. Kimble, who served as KeyCorp's Chief Financial Officer from prior to February 2020 to March 16, 2023, (ECF #1, ¶ 21).

The *Complaint* alleges that KeyCorp has repeatedly downplayed concerns regarding **[*5]** its liquidity while touting the effectiveness of its long-term liquidity strategy. (ECF #1, ¶ 3). The *Complaint* further asserts that KeyCorp repeatedly assured its investors that its strong core deposit base, in conjunction with other funds, supported KeyCorp's liquidity risk management strategy, and that KeyCorp's liquid asset portfolio exceeded the estimated amount needed to manage through an adverse liquidity event. (ECF #1, ¶ 3).

It is alleged that, "throughout the Class Period," defined as "between February 27, 2020 and June 9, 2023, both dates inclusive," (ECF #1, ¶ 1), Defendants made materially false and misleading statements regarding KeyCorp's business, operations, and prospects. (ECF #1, ¶ 4). In particular, the *Complaint* states that "Defendants made false and/or misleading statements and/or failed to disclose that: (i) [KeyCorp] downplayed concerns with its liquidity while overstating the effectiveness of its long-term liquidity strategy; (ii) [KeyCorp] overstated its projected NII for the second quarter ("Q2") and full year ("FY") of 2023, as well as related positive NII drivers, while downplaying negative NII drivers; (iii) as a result, [KeyCorp] was likely to negatively **[*6]** revise its previously issued NII guidance; (iv) all the foregoing, once revealed, was likely to negatively impact [KeyCorp's] business, financial results, and reputation; and (v) as a result, Defendants' public statements were materially false and/or misleading at all relevant times." (ECF #1, ¶ 4) (inserts supplied).

The *Complaint* alleges the following as supporting facts:

On March 6, 2023, KeyCorp filed its presentation slides for the 2023 RBC Capital Markets Financial Institutions as an exhibit to a filing with the U.S. Securities and Exchange Commission, wherein KeyCorp disclosed that it had downwardly revised its FY 2023 guidance for NII, stating that "it expected FY 2023 NII to rise by 1% to 4% (assuming a cumulative beta in the mid to high 30s)[2] compared to FY 2022, representing a significant reduction from KeyCorp's

---

[2] According to the financial investment dictionary found within financial media website *Investopedia*, "Beta is a concept that measures the expected move in a stock relative to movements in the overall market. A beta greater than 1.0 [By definition, the market, such as the S&P 500 Index, has a beta of 1.0] suggests that the stock is more volatile than the broader market, and a beta less than 1.0 indicates a stock with a lower volatility." *What is Beta?*, INVESTOPEDIA.COM, http://investopedia.com/investing/beta-know-risk/# (updated July 12, 2023, visited December 19, 2023) (insert drawn from other portion of the definition text). Given this, it appears that the term "30s" is referring to a "beta" indicator of between 0.30 and 0.39.

prior guidance that FY 2023 NII would rise 6% to 9% compared to FY 2022." (ECF #1, ¶ 5). KeyCorp attributed this negatively revised guidance to "Deposit Beta and Funding Costs," explaining that "[m]arginal funding costs are increasing with rising market interest rates, and are expected to weigh on [NII]." (ECF #1, ¶ 5) (inserts in original). On this news, KeyCorp's **[*7]** stock price fell $0.60 per share, or 3.31%, to close at $17.55 per share on March 7, 2023. (ECF #1, ¶ 6).

On March 13, 2023, following the collapse of Silvergate Bank on March 8, 2023, Silicon Valley Bank on March 10, 2023, and Signature Bank on March 12, 2023, investors grew increasingly concerned about KeyCorp's liquidity. (ECF #1, ¶ 7). That same day, Odeon Capital Group LLC downgraded KeyCorp's stock to "hold" from "buy" and BofA Global Research cut its price target on KeyCorp stock to $17.00 from $20.00. (ECF #1, ¶ 7). On this news, KeyCorp's stock price fell $6.59 per share, or 40.69%, to close at $11.38 per share on March 13, 2023. (ECF #1, ¶ 8).

Then, on June 12, 2023, at the *Morgan Stanley US Financials, Payments & CRE Conference*, KeyCorp's Chief Financial Officer Clark H.I. Khayat disclosed that KeyCorp anticipated Q2 2023 NII to be softer than earlier expected, "based on funding mix and deposit cost pressures." (ECF #1, ¶ 9). At the same conference, KeyCorp's Chairman and Chief Executive Officer Christopher M. Gorman disclosed that clients are demanding higher interest rates on their deposits, and that banks of KeyCorp's size are likely facing higher **[*8]** capital and liquidity requirements by regulators. (ECF #1, ¶ 9). In response to this news, KeyCorp's stock price fell $0.46 per share, or 4.31%, to close at $10.22 per share on June 12, 2023. (ECF #1, ¶ 10).

***The Filing of Proposed Class Action Complaint and Notice Regarding Motions for Appointment as Lead Plaintiff and for Approval of Counsel***

On August 4, 2023, Plaintiff Menachem Gurevitch filed this action in the U.S. District Court for the Northern District of Ohio, on behalf of a class of investors who purchased KeyCorp stock between February 27, 2020 and June 9, 2023, against Defendants asserting violations of Sections 10(b), and *Rule 10b-5* thereunder, and Section 20(a) of the Exchange Act. (ECF #1). Plaintiff, through counsel, then published a notice regarding the pendency of this action on *PRNewswire*, a national, business-oriented newswire service, on August 4, 2023. (ECF #18-2, *Declaration of James R. Cummins* [attached to Movant Titmas' motion], ¶ 2 & ECF #18-5, *PRNewswire Press Release* [attached to Cummins Decl.]). The notice provided that "[i]f you are a shareholder or

otherwise purchased or acquired Key securities during the Class Period, you have until October 3, 2023 to ask the Court to appoint you as Lead Plaintiff for the class." **[*9]** (ECF #18-5). Three timely motions for appointment as Lead Plaintiff and for approval of class counsel were filed. (ECF #18 [by Robert J. Titmas]; ECF #19 [by Richard Thompson]; ECF #20 [by Thomas Marcotte]).[3] The third motion, by Thomas Marcotte, was effectively withdrawn shortly thereafter. (ECF #21).

The Court then heard oral argument in open court on the competing motions of Robert J. Titmas and Richard Thompson on November 28, 2023. (*See* ECF #24, *Order of 10/23/2023* & ECF #31, *Minutes of Proceedings 11/28/2023*).

## II. SELECTION OF LEAD PLAINTIFF AND COURT APPROVAL OF LEAD AND LIAISON COUNSEL

### *Selection of Lead Plaintiff*

The Private Securities Litigation Reform Act of 1995 ("PSLRA") governs the procedure relating to the appointment of the lead plaintiff in "each private action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." *15 U.S.C. § 78u-4(a)(1)*. Under the PSLRA, the plaintiff who files the initial action must, within 20 days of filing the complaint, publish notice to the class informing potential class members of the pendency of the action, the claims asserted **[*10]** in the complaint, the purported class period, and the right of any member of the purported class to move the Court to serve as lead plaintiff on behalf of the purported class. *15 U.S.C. § 78u-4(a)(3)(A)(1)*. Plaintiff Gurevitch published the required notice the same day as filing his complaint. (ECF #18-2, *Declaration of James R. Cummins* [attached to Movant Titmas' motion], ¶ 2 & ECF #18-5, *PRNewswire Press Release* [attached to Cummins Decl.]).

Within 60 days of publication of the notice, any person or group of persons who are members of the proposed class may move the Court for appointment to serve as lead plaintiff. *15 U.S.C. § 78u-4(a)(3)(B)(i)*. The notice in this case identified the cut-off date for the filing of such motion as October 3,

---

[3] Although Plaintiff Menachem Gurevitch filed a declaration stating his willingness to serve as a representative party for the proposed class, the declaration also indicated his "understand[ing] that the Court has the authority to select the most adequate lead plaintiff in this action." (ECF #1-2, *Certificate of Menachem Gurevitch Pursuant to Federal Securities Laws*, ¶ 4). He did not thereafter move to be named Lead Plaintiff.

2023. (ECF #18-5). All three of the motions seeking appointment as lead plaintiff were filed timely with the Court on that day. (ECF #18, #19, #20).

Within 90 days after publication of the notice, under the PSLRA, "the Court shall consider any motion made by a purported class member in response to the notice, including any motion made by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff **[*11]** class that the court determines to be the most capable of adequately representing the interests of class members." *15 U.S.C. § 78u-4(a)(3)(B)*.

**Initial Determination of a "Presumptive" Lead Plaintiff**

The PSLRA sets forth the following factors for the Court to use in making its decision:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under [the Exchange Act] is the person or group of persons that --
>> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
>>
>> (bb) in the determination of the court, has the largest financial interest in the relief the *and*
>> (cc) otherwise satisfies the requirements of *Rule 23 of the Federal Rules of Civil Procedure*.

*15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)*(emphasis supplied).

*Timely Filing of Motion*

As to the first factor, both movants, Robert J. Titmas and Richard Thompson, made motions.

*Largest Financial Interest*

With respect to the second factor, determining the plaintiff with the largest financial interest, "[t]he PSLRA does not specify which test should be used to determine which plaintiff has the 'largest financial interest in the relief sought by the class,'" *City of Hollywood Firefighters' Pension Fund v. TransDigm Grp., Inc. No. 17-CR-1958, 2017 U.S. Dist. LEXIS 199868 at *6-*7, 2017 WL 6028213 at *2 (N.D. Ohio Dec. 5, 2017)*, but "[s]ome courts simply determine which potential lead plaintiff has suffered the greatest total losses, while other courts apply **[*12]** the *Lax [v. First Merchants Acceptance Corp., No. 97-Civ-2715, 1997 U.S. Dist. LEXIS 11866 at *17, 1997 WL 461036 at *5 (N.D. Ill. Aug. 11, 1997)]* four factor test, which examines (1) the number of

shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period." *City of Hollywood, 2017 U.S. Dist. LEXIS 199868 at *7, 2017 WL 6028213 at *2*. *See Takara Trust v. Molex, Inc., 229 F.R.D. 577, 579 (N.D. Ill. 2005)* (looking solely to greatest losses); *In re the Goodyear Tire & Rubber Co. Sec. Litig., No. 5:03-CV-2166, 2004 U.S. Dist. LEXIS 27043 at *16-*17. 2004 WL 3314943 at *3 (N.D. Ohio May 12, 2004)* (applying *Lax* factors and collecting cases); *see also Owens v. FirstEnergy Corp., Nos. 20-CV-3785, 20-CV-4827, 2020 U.S. Dist. LEXIS 219573 at *17, 2020 WL 6873421 at *5 (S.D. Ohio Nov. 23, 2020)* (applying what has become known as the *Olsten/Lax* test); *In re Cendant Corp. Litig., 264 F.3d 201, 262 (3d Cir. 2001)* (applying test effectively similar to *Lax/Olsten* factors in a three-part test).

To calculate losses, District Courts favor using a "last in, first out" (LIFO) method over using a "first in, first out" (FIFO) method. *Plagens v. Deckard, No. 20-CV-2744, 2021 U.S. Dist. LEXIS 143359 at *23, 2021 WL 3284265 at *7 (N.D. Ohio Aug. 2, 2021)*.[4] Some courts modify the LIFO

_____

[4] The *Plagens* decision described the difference between FIFO and LIFO in this context:

> FIFO calculates loss by matching purchases of stock against sales in the order in which each occurs:
>
> [T]he first shares sold are matched against the first shares purchased. If the "first shares purchased" are pre-class period purchases, then the first shares sold are matched against these pre-class purchases and the resulting gain or loss is excluded from the loss calculation. Thereafter, class period sales are matched against class period losses. For any shares retained at the end of the class period, those shares are assigned a value, often a 60-day or 90-day post-fraud disclosure average.
>
> *In re Cardinal Health, Inc. Sec. Litig., 226 F.R.D. 298, 303 (S.D. Ohio 2005)*. Under the FIFO method, "a plaintiff can 'zero out' class period sales by matching them to pre-class period purchases, which can 'grossly inflate' damages" *Owens [v. FirstEnergy Corp., Nos. 20-CV-3785, 20-CV-4287], 2020 U.S. Dist. LEXIS 219573 [at *19-*20], 2020 WL 6873421 at *6 [(S.D. Ohio Nov. 23, 2020)]*.
>
> Under the LIFO method, in contrast, "a plaintiff's gains during the class period are offset from its ultimate losses." *Id.* That is, any sale of stock during the class period is "matched against" the last shares purchased. *Id.* "In other words, LIFO helps reveal whether plaintiffs actually profited from class period transactions due to inflated stock prices." *Id.*
>
> *Plagens, 2021 U.S. Dist. LEXIS 143359 at *22-*23, 2021 WL*

calculation by only considering shares held at the time of a corrective disclosure. *Plagens, 2021 U.S. Dist. LEXIS 143359 at *22, 2021 WL 3284265 at *7* ("[One of the movants] advocates a 'modified LIFO methodology' that the Second Circuit uses, which excludes losses from investments sold before a corrective disclosure is made"); *see also Peacock v. Dutch Bros., Inc., No. 23-CV-1794, 2023 U.S. Dist. LEXIS 135360 at *9, 2023 WL 4976814 at *4 (S.D.N.Y. Aug. 3, 2023)* ("[T]he LIFO methodology excludes losses incurred from 'in-and-out' transactions" which are when "a prospective lead plaintiff purchases and sells their holdings during the class period — that is, after the stock price was allegedly fraudulently **[*13]** inflated and before it dropped due to a corrective disclosure").

The movants **[*14]** here do not disagree on the use of a LIFO method of calculating loss, and each has measured their losses using a form of LIFO calculation. (*See* ECF #18-1 [Titmas], PageID #89; ECF #23 [Thompson], PageID #388). In fact, each of them have offered charts reflecting similar loss calculations:[5]

⊞*Go to table1*

There is no real dispute between Movants Titmas and Thompson that under either of the LIFO-based tests, Thompson's loss calculation is greater.

*Satisfaction of Federal Rule of Civil Procedure 23 Requirements*

However, under the PSLRA, for the presumption to exist that the movant with the greatest financial loss is "the most adequate" lead plaintiff, that movant must *also* "otherwise satisf[y]the requirements of *Rule 23 of the Federal Rule of Civil Procedure*." *15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc)*. *Federal Rule of Civil Procedure 23(a)* provides that a party may serve as a class representative only if the following four requirements are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the **[*15]** class; and (4) the representative parties will fairly and adequately protect the interests of the class. *FED. R. CIV. P. 23(a)*. "At this early stage in the litigation, however, only the last two factors — typicality and adequacy — are

---

*3284265 at *7* (inserts supplied).

[5] This chart is drawn primarily from that found in Movant Thompson's motion papers (ECF #23, PageID #388). Calculations related to the since-withdrawn Movant Marcotte motion have been omitted.

pertinent." *Rodriguez v. Draftkings, Inc., No. 21-Civ-5739, 2021 U.S. Dist. LEXIS 219489 at *17-*18, 2021 WL 5282006 at *6 (S.D.N.Y Nov. 12, 2021)*. Thus, in deciding a motion to serve as lead plaintiff, the Court limits its inquiry to the typicality and adequacy prongs of *Rule 23(a)* and defers its examination of the remaining requirements until a motion for class certification is made. *Lax v. First Merchants Acceptance Corp., No. 97-Civ-2715, 1997 U.S. Dist. LEXIS 11866 at *20, 1997 WL 461036 at *6 (N.D. Ill. Aug. 11, 1997)*; *Ohio Public Employees Ret. Sys. v. Fannie Mae, 357 F. Supp. 2d 1027, 1034 (S.D. Ohio 2005)*.

The threshold determination of whether the movant with the largest financial losses satisfies the typicality and adequacy requirements should be the product of the Court's independent judgment, and arguments by members of the purported plaintiff class as to why it does not should be considered only in the context of assessing whether the presumption has been rebutted. *Sklar v. Amarin Corp. PLC, No. 13-CV-06663, 2014 U.S. Dist. LEXIS 103051 at *20-21, 2014 WL 3748248 at *6 (D.N.J. July 29, 2014)*; citing *In re Cendant Corp. Litig, 264 F.3d 201, 263-64 (3d Cir. 2001)*.

At the outset, and because he has put forward evidence of having the largest financial losses, the Court examines the PSLRA standards initially under a "presumption" that Movant Thompson is the "most adequate plaintiff" and then considers whether Movant Titmas has rebutted that "presumption" to show that he is "most adequate" to serve as lead plaintiff.

*Typicality [*16]*

A lead plaintiff's claims are typical where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez, 2021 U.S. Dist. LEXIS 219489 at *18, 2021 WL 5282006 at *6*; quoting *Sgalambo v. McKenzie, 268 F.R.D. 170, 173-74 (S.D.N.Y. 2010)*.

At first glance, Movant Thompson's claims appear to be typical of the claims asserted by the proposed class, as stated in his motion:

> Like all members of the Class, Thompson alleges that Defendants' material misstatements and omissions concerning [KeyCorp's] business, operations, and financial prospects violated the federal securities laws. Thompson, like all of the members of the Class, purchased Key securities in reliance on Defendants' alleged misstatements and omissions and were damaged thereby. Thompson's losses, like the losses suffered by all other members of the Class, arise from the artificial inflation of the Company's securities caused by

ADAM APTON

defendants' alleged misrepresentations and omissions.

Movant Titmas challenges the ability of Movant Thompson to satisfy the "typicality" requirement by pointing out that Thompson's stock purchase history could subject his claims to defenses of being an "in-and-out" trader, generally defined as whether someone had bought and sold all [*17] of their shares during the class period, such that litigation focused on his claims could be either directly harmful to the interests of other putative class members not subject to such a possible defense, or could present difficult potential unnecessary and complicated distractions to the pursuit of plaintiffs' claims as a whole. (ECF #26, *Titmas Reply Brief*, PageID #406) ("Mr. Thompson is not typical of the Class he seeks to represent because he engaged in 'in-and-out' trading throughout the Class Period that would 'dog' the Class during the life of this litigation should he be appointed"). In support, he points out that "Mr. Thompson purchased thousands of shares and entirely exited his position *10 separate times* during the Class Period. Out of those 10 separate exits, 9 of them resulted in Mr. Thompson selling his shares for a *profit* that he then excluded from his loss analysis." (ECF #26, PageID #405) (emphasis in original). Specifically, Titmas asserts that "shareholders that engage in 'in-and-out' trading strategies are unable to establish the element of 'reliance' in a Section 10(b) and *Rule 10b-5* securities fraud lawsuit, as their trading pattern suggests they did not rely on the alleged misstatements [*18] and omissions." (*Id.*).

In response, Movant Thompson does not deny that he did in fact entirely exit his position in KeyCorp stock on many occasions during the proposed class period (and as indicated in the chart included as part of his motion), but he denies being subject to disqualification as a "most adequate plaintiff" because of "in-and-out" trading because he had purchased some shares during the class period that he held at the time of each corrective disclosure. (ECF #25, *Thompson Reply Brief*, PageID #397).

In a related argument, Movant Titmas also seeks to rebut a "presumption" that Movant Thomas satisfies the "typicality" requirement based on the "high frequency" of what he identifies as Thompson's trading history, again highlighting the 10 instances of what Titmas characterizes as Thompson's "in-and-out" purchase and sale events. (ECF #22, PageID #374). Thompson denies being a "high frequency" trader, at least as in comparison to the "super high frequency" traders disqualified for that reason identified in cases cited in his motion papers. (ECF #25, PageID #400).

On the other hand, there is no dispute that Movant Titmas can satisfy the typicality requirement in that his trading [*19] history with respect to the claims is that he acquired his

10,800 shares of KeyCorp stock during the proposed class period, held all of those 10,800 shares through to the end of the class period, and claims damages. (ECF #26, PageID #405).

Both movants cite numerous cases to support their positions, with Movant Titmas' position summed up in the analysis adopted by the court in *Rodriguez v. Draftkings, Inc., No. 21-Civ-5739, 2021 U.S. Dist. LEXIS 219489 at *17-*18, 2021 WL 5282006 at *10-*11 (S.D.N.Y Nov. 12, 2021)*, where the court, collecting numerous cases where factors of "in-and-out" trading, day trading, short-sell trading, and high volume trading in the "presumptive lead plaintiff's" trading record were key elements in the court's finding that the necessary element of "typicality of claims" was lacking, and finding that the presumption that the plaintiff with the highest losses was the "most adequate plaintiff" was effectively rebutted by a movant with a lesser loss amount. In turn, Movant Thompson's position is summed up in the analysis adopted by the court in *Sklar v. Amarin Corp. PLC, No. 13-CV-06663, 2014 U.S. Dist. LEXIS 103051 at *25-*32, 2014 WL 3748248 at *8-*9 (D.N..J. July 29, 2014)*, where the court, collecting equally numerous cases supporting the position that "in-and-out" trading, day trading, short-sell trading, and high volume trading were not *necessarily* disqualifying factors to rebut the presumption that the movant claiming the [*20] greatest loss is presumptively the "most adequate plaintiff," ultimately appointed such movant to the role of lead plaintiff.

As earlier noted, "[t]he threshold determination of whether the movant with the largest financial losses satisfies the typicality and adequacy requirements should be the product of the Court's independent judgment." *Sklar v. Amarin Corp., 2014 U.S. Dist. LEXIS 103051 at *20-*21, 2014 WL 3748248 at *6*.

This Court finds that the possibility of unique defenses as to, at least portions of, Movant Thompson's trading history in KeyCorp stock, as well as the potential distractions that litigation over his trading history (even if not successful) might cause, work to rebut the presumption that Movant Thompson is the "most adequate plaintiff," especially in light of the fact that Movant Titmas' claims are subject to *none* of these distracting factors (or any others that are apparent). The Court tends to agree with the consideration expressed by the court in *Rodriguez* that it is not the predicted ultimate *success* of distracting, or even claim destroying, defenses that rebuts the presumption that the movant claiming the highest loss is the "most adequate plaintiff," but rather the foreseeable *possibility* of it, especially when the movant with the second most [*21] highest losses presents none of these distractions:

[Movant with the highest loss claim] defends his bid for

lead status by pointing to the numerous courts in this District that have appointed as lead plaintiffs, or certified classes represented by, litigants who have engaged in short-selling and/or day trading. (Citation of numerous cases not disqualifying presumptive lead plaintiff despite short-selling or day trading omitted). ***But while [movant with the highest loss claim] might ultimately succeed in persuading the Court that his idiosyncrasies ought not defeat class certification or harm his claims' prospects on the merits, the interests of the class disfavor exposing it to the risk that his history will dog him. The question whether [movant with the highest loss claim's] trading practice compromise his claims and his adequacy as a class representative is sure to arise in the litigation. That potential to distract militates against his appointment***. See *Batter [v. Hecla Mining Co., No. 19-Civ-4883], 2020 U.S. Dist. LEXIS 51665 [at \*20-\*21], 2020 WL 1444934 at \*7 [(S.D.N.Y. Mar. 25, 2020)]*. As the court in *Galmi [v. Teva Pharms. Indus., 302 F. Supp. 3d 485 (D. Conn. 2017)]* aptly put the point" "***The question is whether the appointment of a particular lead plaintiff would lead to the defendant raising unique defenses against that lead plaintiff that would unnecessarily complicate and/or [\*22] stall the litigation***." *302 F. Supp. 3d at 504 n.10* (citing *George v. China Auto Sys., Inc., No. 11-Civ-7533 (KBF), 2013 U.S. Dist. LEXIS 93698, 2013 WL 3357170 at \*7 (S.D.N.Y. July 3, 2013)*).

* * * *

In sum, even had [movant with the highest loss claim] merited presumptive status as lead plaintiff, that status would have been effectively rebutted. [Citation of numerous cases disqualifying presumptive lead plaintiff based on concerns of unique defenses or distraction of litigation omitted].

*Rodriguez, 2021 U.S. Dist. LEXIS 219489 at \*27-\*28, 2021 WL 5282006 at \*10-\*11* (inserts and emphasis supplied).

*Adequacy*

A lead plaintiff is adequate where he or she "does not have interests that are antagonistic to the class that he [or she] seeks to represent and has retained counsel that is capable and qualified to vigorously represent the interests of the class that he [or she] seeks to represent." *Rodriguez, 2021 U.S. Dist. LEXIS 219489 at \*23, 2021 WL 5282006 at \*8* (quoting *Glauser v. EVCI Ctr. Coils. Holding Corp., 236 F.R.D. 184, 189 (S.D.N.Y. 2006)*) (inserts in original).

Here, while Movant Titmas occasionally characterizes his arguments as to in-and-out trading and high volume trading as

"adequacy" challenges rather then "typicality" challenges, neither movant seems to have interests "antagonistic" to the potential class. Each has a "sufficient interest in the outcome to ensure vigorous advocacy on behalf of the class." *Rodriguez, 2021 U.S. Dist. LEXIS 219489 at \*24, 2021 WL 5282006 at \*8* (citations omitted). Both Titmas and Thompson have retained experienced and qualified proposed lead and liaison counsel. Unlike the factor of typicality, **[\*23]** on which Movant Titmas has effectively rebutted the presumption that Movant Thompson is the "most adequate plaintiff," the factor of true adequacy is not a determinative one here.

In the end, the Court finds that the "presumption" that the Plaintiff with the highest claimed Movant is the "most has been rebutted by Movant Titmas, and therefore finds that Robert J. Titmas, who claims the second-most highest loss is the "most adequate plaintiff" to serve as Lead Plaintiff in this Action.

### Court Approval of Selection of Lead and Liaison Counsel

The PSLRA further provides that "[t]he most adequate plaintiff shall, subject to approval of the court, select and retain counsel to represent the class." *15 U.S.C. § 78u-4(a)(3)(B)(v)*. The evidence shows that Movant Titmas has selected and proposed highly qualified Lead Counsel, Levi & Korsinsky, LLP, and Liaison Counsel, Cummins Law LLC, to represent the interests of the proposed class, each of which have extensive experience in conducting complex litigation on behalf of shareholders, including major securities class and derivative actions nationwide. (*See* ECF #18-7, PageID #113-190 [Levi & Korsinsky] & ECF #18-7, PageID #192-197 [Cummins Law LLC]). Accordingly, Movant Titmas' **[\*24]** selection of Lead Counsel and Liaison Counsel is hereby approved.

### IV. SELECTION OF LEAD PLAINTIFF AND APPROVAL OF COUNSEL

Accordingly, for the reasons stated above, the *Motion of Robert J. Titmas for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #18) is GRANTED.[6]

Robert J. Titmas is APPOINTED to serve as Lead Plaintiff in this Action pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, *15 U.S.C. § 78u-4(a)(3)(B)*, as amended by the Private Securities Litigation Reform Act of

---

[6] Accordingly, the *Motion of Richard Thompson for Appointment as Lead Plaintiff and Approval of Counsel* (ECF #19) is denied as moot.

ADAM APTON

1995.

Robert J. Titmas' selection of Lead Counsel and Liaison Counsel is APPROVED, and Levi & Korsinsky is appointed as Lead Counsel for the Proposed Class, and Cummins Law LLC is APPOINTED as Liaison Counsel for the Proposed Class.

*Responsibilities of Lead Counsel*

Lead Counsel shall have the following responsibilities and duties, to be carried out either personally or through counsel whom Lead Counsel shall designate, including specifically Liaison Counsel:

1. To coordinate the briefing and argument of any and all motions;
2. To coordinate the conduct of any and all discovery pleadings;
3. To coordinate the examination of any and all witnesses in depositions;
4. To enter into stipulations with opposing counsel necessary for [*25] the conduct of this Action;
5. To coordinate the selection of counsel to act as spokesperson(s) at all pretrial conferences;
6. To call meetings of the Plaintiffs' counsel as they deem necessary and appropriate from time to time;
7. To coordinate all settlement negotiations with counsel for Defendants;
8. To coordinate and direct pretrial discovery proceedings, preparation for trial, and trial of this matter and delegate work responsibilities to selected counsel as may be required;
9. To coordinate the preparation and filings of all pleadings;
10. To prepare and distribute to the Plaintiffs periodic status reports;
11. To maintain adequate time and expense records covering services of all individuals in their offices and all members to whom tasks are delegated;
12. To assure that schedules are met and unnecessary expenditures of time and funds are avoided; and
13. To supervise all other matters concerning the prosecution of the claims asserted in the Action.

No motion, discovery request, or other pretrial proceedings shall be initiated or filed by any Plaintiffs without the approval of Lead Counsel, so as to prevent duplicative pleadings or discovery by Plaintiffs. No settlement negotiations [*26] shall be conducted without the approval of Lead Counsel.

Service upon any Plaintiff of all pleadings, motions, or other papers in the Action, except those specifically addressed to a Plaintiff other than Lead Plaintiff, shall be completed upon service of Lead Counsel. Service upon Lead Counsel is sufficient service except in the following circumstances:

Defaults, Sanctions: Motions claiming default or seeking other penalties or sanctions against a party for failure to take some action within a time period measured from the date of service of a document MUST be served on counsel of record for that party as well as on Lead Counsel;

Case Specific Filings: Case specific filings (*i.e.*, papers that effect only a particular party or particular case — for example, a motion seeking to dismiss a party in a case or to remand a case to state court) MUST be served on counsel in that specific case, as well as on Lead Counsel.

Lead Counsel shall be the contact between Plaintiffs and Plaintiffs' counsel and Defendants' counsel, as well as the spokespersons for all Plaintiffs' counsel, and shall direct and coordinate the activities of Plaintiffs' counsel. Lead Counsel shall be the contact between the Court [*27] and Plaintiffs and their counsel.

The Clerk of Court shall copy each order to Lead Counsel for distribution as appropriate to counsel and parties. The Clerk shall also serve each order to all counsel who have registered for Electronic Service.

*Newly Filed or Transferred Actions*

The file in Case No. 1:23-CV-1520 shall constitute the master file for this Action and any other case that may be subsequently filed in this Court or transferred to this Court from another court. When a document being filed pertains to all such actions, the phrase "All Actions" shall appear immediately after the phrase "This Document Relates To:". When a pleading applies to some, but not all, of such actions, the document shall list, immediately after the phrase "This Document Relates To:", the Docket number for each individual action to which the document applies, along with the last name of the first-listed Plaintiff in said action.

When a case that arises out of the subject matter of this Action is hereinafter filed in this Court or transferred to this Court from another court, the Clerk of this Court shall:

1. File a copy of this Court's *Order* accompanying this *Memorandum of Opinion* in the separate file for such [*28] action;

2. Mail a copy of such *Order* to the attorneys for the Plaintiff(s) in the newly filed or transferred case and to

ADAM APTON

any new Defendant(s) in the newly filed or transferred case; and

3. Make the appropriate entry in the Docket for this Action.

Each new case arising out of the subject matter of this Action that is filed in this Court or transferred to this Court shall be consolidated with this Action and the *Order* accompanying this *Memorandum of Opinion* in this Action shall apply thereto, unless a party objecting to such *Order* or any provision of such *Order* shall, within ten (10) days after the date upon which a copy of such *Order* is served on counsel for such party, file an application for relief from such *Order* or any provision therein and this Court deems it appropriate to grant such application.

During the pendency of this litigation, or until further order of this Court, the parties shall take reasonable steps to preserve all documents within their possession, custody, or control, including computer-generated and stored information and materials such as computerized data and electronic mail, containing information that is relevant to or may lead to the discovery of information to **[*29]** the subject matter of the pending litigation.

IT IS SO ORDERED.

/s/ Donald C. Nugent

DONALD C. NUGENT

United States District Judge

DATED: December 26, 2023

## **ORDER**

Pursuant to the *Memorandum of Opinion* issued in the above captioned case: the *Motion of Robert J. Titmas for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #18) is GRANTED.

Robert J. Titmas is APPOINTED to serve as Lead Plaintiff in this Action pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, *15 U.S.C. § 78u-4(a)(3)(B)*, as amended by the Private Securities Litigation Reform Act of 1995.

Robert J. Titmas' selection of Counsel is APPROVED, and Levi & Korsinsky is appointed as Lead Counsel for the Proposed Class, and Cummins Law LLC is APPOINTED as Liaison Counsel for the Proposed Class.

*Responsibilities of Lead Counsel*

Lead Counsel shall have the following responsibilities and duties, to be carried out either personally or through counsel whom Lead Counsel shall designate, including specifically Liaison Counsel:

1. To coordinate the briefing and argument of any and all motions;

2. To coordinate the conduct of any and all discovery pleadings;

3. To coordinate the examination of any and all witnesses in depositions;

4. To enter into stipulations with opposing counsel necessary for the conduct of this Action;

5. To coordinate **[*30]** the selection of counsel to act as spokesperson(s) at all pretrial conferences;

6. To call meetings of the Plaintiffs' counsel as they deem necessary and appropriate from time to time;

7. To coordinate all settlement negotiations with counsel for Defendants;

8. To coordinate and direct pretrial discovery proceedings, preparation for trial, and trial of this matter and delegate work responsibilities to selected counsel as may be required;

9. To coordinate the preparation and filings of all pleadings;

10. To prepare and distribute to the Plaintiffs periodic status reports;

11. To maintain adequate time and expense records covering services of all individuals in their offices and all members to whom tasks are delegated;

12. To assure that schedules are met and unnecessary expenditures of time and funds are avoided; and

13. To supervise all other matters concerning the prosecution of the claims asserted in the Action.

No motion, discovery request, or other pretrial proceedings shall be initiated or filed by any Plaintiffs without the approval of Lead Counsel, so as to prevent duplicative pleadings or discovery by Plaintiffs. No settlement negotiations shall be conducted without the approval of **[*31]** Lead Counsel.

Service upon any Plaintiff of all pleadings, motions, or other papers in the Action, except those specifically addressed to a Plaintiff other than Lead Plaintiff, shall be completed upon service of Lead Counsel. Service upon Lead Counsel is sufficient service except in the following circumstances:

Defaults, Sanctions: Motions claiming default or seeking other penalties or sanctions against a party for failure to take some action within a time period measured from the date of service of a document MUST be served on counsel of record

ADAM APTON

for that party as well as on Lead Counsel;

Case Specific Filings: Case specific filings (*i.e.*, papers that effect only a particular party or particular case — for example, a motion seeking to dismiss a party in a case or to remand a case to state court) MUST be served on counsel in that specific case, as well as on Lead Counsel.

Lead Counsel shall be the contact between Plaintiffs and Plaintiffs' counsel and Defendants' counsel, as well as the spokespersons for all Plaintiffs' counsel, and shall direct and coordinate the activities of Plaintiffs' counsel. Lead Counsel shall be the contact between the Court and Plaintiffs and their counsel.

The Clerk **[*32]** of Court shall copy each order to Lead Counsel for distribution as appropriate to counsel and parties. The Clerk shall also serve each order to all counsel who have registered for Electronic Service.

*Newly Filed or Transferred Actions*

The file in Case No. 1:23-CV-1520 shall constitute the master file for this Action and any other case that may be subsequently filed in this Court or transferred to this Court from another court. When a document being filed pertains to all such actions, the phrase "All Actions" shall appear immediately after the phrase "This Document Relates To:". When a pleading applies to some, but not all, of such actions, the document shall list, immediately after the phrase "This Document Relates To:", the Docket number for each individual action to which the document applies, along with the last name of the first-listed Plaintiff in said action.

When a case that arises out of the subject matter of this Action is hereinafter filed in this Court or transferred to this Court from another court, the Clerk of this Court shall:

1. File a copy of this *Order* in the separate file for such action;

2. Mail a copy of this *Order* to the attorneys for the Plaintiff(s) in the newly **[*33]** filed or transferred case and to any new Defendant(s) in the newly filed or transferred case; and
3. Make the in the Docket for this Action.

Each new case arising out of the subject matter of this Action that is filed in this Court or transferred to this Court shall be consolidated with this Action and this *Order* shall apply thereto, unless a party objecting to this *Order* or any provision of this *Order* shall, within ten (10) days after the date upon which a copy of this *Order* is served on counsel for such

party, file an application for relief from this *Order* or any provision therein and this Court deems it appropriate to grant such application.

During the pendency of this litigation, or until further order of this Court, the parties shall take reasonable steps to preserve all documents within their possession, custody, or control, including computer-generated and stored information and materials such as computerized data and electronic mail, containing information that is relevant to or may lead to the discovery of information to the subject matter of the pending litigation.

IT IS SO ORDERED.

/s/ Donald C. Nugent

DONALD C. NUGENT

United States District Judge

DATED:        December        26,        2023

ADAM APTON

2023 U.S. Dist. LEXIS 228988, *33

**Table1** (*Return to related document text*)

| Movant | Gross Shares Purchased | Net Shares Purchased | Net Expenditure | LIFO Modified | LOSS Unmodified |
|---|---|---|---|---|---|
| Thompson | 83,900 | 19,000 | $350,324.86 | $173,921.20 | $145,556.96 |
| Titmas | 10,800 | 10,800 | $151,379.00 | $34,984.61 | $34,984.61 |

**Table1** (*Return to related document text*)

---

**End of Document**

ADAM APTON