James E. Cecchi
Kevin Cooper
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*

Steven B. Singer (*pro hac vice*
forthcoming)
Sara DiLeo (*pro hac vice*)
**SAXENA WHITE P.A.**
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ssinger@saxenawhite.com
sdileo@saxenawhite.com

*Counsel for Lead Plaintiffs and Lead*
*Counsel for the Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTOPHER ARBOUR, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> TINGO GROUP, INC. F/K/A MICT, INC., DOZY MMOBUOSI, DARREN MERCER, and KEVIN CHEN, <br><br> Defendants. | Case No. 2:23-cv-03151-ES-MAH <br><br> Hon. Esther Salas <br><br> **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................2

II.     JURISDICTION & VENUE ...............................................................7

III.    PARTIES ............................................................................................8

        A.      Lead Plaintiffs ................................................................8

        B.      Defendants......................................................................8

IV.     OVERVIEW OF DEFENDANTS' FRAUD....................................11

        A.      Background of MICT and its Acquisition of Tingo Mobile ..............11

        B.      MICT Acquires Tingo Foods and Becomes Tingo Group Inc. ..........14

        C.      Defendants Hyped Tingo's Business Activities and Profitability
                to Investors Throughout the Class Period ............................16

        D.      The Hindenburg Report Reveals Tingo as a "Brazen Fraud"............21

        E.      Post-Class Period Events Confirm Defendants' Statements
                Were False and the Company's Business Was Fabricated ................26

                1.      The SEC Finds Defendants' Fraud "Staggering" and
                        Forever Bans Defendant Mmobuosi from Operating a
                        Public Company........................................................27

                2.      Defendants Are Forced to Admit that Tingo's Financial
                        Statements "Should No Longer Be Relied Upon"....................32

                3.      The DOJ Indicts Defendant Mmobuosi ....................................33

                4.      Tingo's Auditor Resigns ............................................34

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS ................................................................................35

        A.      December 1, 2022 – MICT Acquires Tingo Mobile..........................36

        B.      March 31, 2023 – Fiscal Year 2022 Results ......................................38

i

C.     April 27, 2023 – Tingo Foods Audited Financials..............................44

D.     May 1, 2023 – Taglich Brothers Investment Conference ..................46

E.     May 15, 2023 – First Quarter 2023 Results ........................................48

F.     May 30, 2023 – Tingo DMCC Press Release ......................................55

VI.    ADDITIONAL ALLEGATIONS OF SCIENTER .......................................56

VII.   LOSS CAUSATION ......................................................................................65

VIII.  PRESUMPTION OF RELIANCE ................................................................66

IX.    THE STATUTORY SAFE HARBOR DOES NOT APPLY TO
DEFENDANTS' FALSE AND MISLEADING STATEMENTS...............68

X.     CLASS ACTION ALLEGATIONS................................................................70

XI.    COUNTS ........................................................................................................72

COUNT I..........................................................................................................72

FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND
RULE 10B-5 AGAINST ALL DEFENDANTS ..........................................72

COUNT II ........................................................................................................73

FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
AGAINST THE INDIVIDUAL DEFENDANTS.........................................73

XII.   PRAYER FOR RELIEF ...............................................................................75

JURY DEMAND ................................................................................................75

Lead Plaintiffs Perdeep Kanda and Pavel Krykhtin (together, "Lead Plaintiffs"), by and through their undersigned counsel, bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), against Tingo Group, Inc. f/k/a MICT, Inc. ("Tingo," "MICT," or the "Company") and certain of its executive officers (collectively, "Defendants"). Lead Plaintiffs bring these claims on behalf of a putative class of investors who purchased or otherwise acquired Tingo securities from December 1, 2022 through June 5, 2023, inclusive (the "Class Period"), and were damaged thereby.

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts are based upon the investigation of Lead Plaintiffs, conducted by and through and their counsel, including review and analysis of: (1) transcripts, press releases, news articles, and other public statements issued by or concerning Tingo; (2) research reports issued by financial analysts concerning the Company; (3) reports and other documents filed publicly by Tingo with the U.S. Securities and Exchange Commission ("SEC"); (4) Tingo's corporate website; (5) analyses of the price movements in Tingo's securities; (6) pleadings and other court documents filed in legal proceedings pending against one or more of the Defendants, including documents filed in the civil action by the SEC, *SEC v. Mmobuosi, et al.*,

Case No. 1:23-cv-10928 (S.D.N.Y.) (the "SEC Action"), and the criminal action by the U.S. Department of Justice ("DOJ"), *U.S. v. Mmbuosi*, Case No. 1:23-cr-00601 (S.D.N.Y.), among others; and (7) other publicly available information.

Lead Plaintiffs' investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I.    INTRODUCTION[1]

1.    This is a securities fraud class action arising out of what the SEC and DOJ have charactered as a "***staggering***" fraud and "***massive scheme***" in which Defendants "***booked billions of dollars' worth of fictitious transactions***" to sham Nigerian companies that they founded and controlled, thereby falsely "***reporting hundreds of millions of dollars of non-existent revenues and assets***." When Defendants' fraudulent scheme was exposed on June 6, 2023 via publication of a damning news report, Tingo's stock price collapsed, falling over 48% and wiping out $145 million in market capitalization.

2.    Since then, trading in Tingo's stock was halted; the SEC commenced a wide-ranging investigation resulting in securities fraud charges against the Company

---

[1] Unless otherwise indicated, all emphasis has been added.

and Defendant Dozy Mmobuosi ("Mmobuosi"); and the DOJ indicted Defendant Mmobuosi for defrauding the SEC and Tingo's independent auditors and absconding with Company property. After the media and the Company's regulators detailed the scope of Defendants' fraudulent scheme to the market, Defendants finally were forced to admit that Tingo's consolidated financial statements were fabricated for the *entire* Class Period and "***should no longer be relied upon.***" Tingo has since been officially delisted as a publicly traded company and Defendant Mmobuosi presently is a fugitive on the run.

3.      Specifically, Tingo purports to be an agricultural financial technology ("agri-fintech") company operating primarily in Africa. On December 1, 2022—the first day of the Class Period—Tingo announced the closing of its acquisition of Tingo Mobile Limited ("Tingo Mobile") from Defendant Mmobuosi, Tingo Mobile's founder and controller. This acquisition was quickly followed in February 2023 by Tingo's acquisition of a second company founded and controlled by Defendant Mmobuosi, Tingo Foods PLC ("Tingo Foods").

4.      Throughout the Class Period, Defendants routinely assured investors that Tingo Mobile and Tingo Foods were legitimate and thriving companies that would add hundreds of millions of dollars to the Company's bottom line. For example, in the press release announcing the acquisition of Tingo Mobile, Defendants emphasized that "***this acquisition markedly strengthens our balance***

3

***sheet and makes us immediately significantly profitable. We therefore expect to report substantial earnings for Q4 2022, followed by material quarter over quarter growth in both revenues and profitability in 2023 and beyond***." Similarly, following the acquisition of Tingo Foods, Defendant Mmobuosi lauded himself for "***establishing and growing Tingo Foods to be a sizeable and profitable business***[.]" Additionally, Defendants continuously asserted that Tingo Mobile and Tingo Foods had generated sizeable profits in the financial statements reported by the Company.

5.     Defendants' statements concerning the Company's blooming business prospects and solid financial results were materially false and misleading when made. In reality, despite Defendants' routine assurances to the contrary, neither Tingo Mobile nor Tingo Foods ever conducted any legitimate business activities, and they were not profitable companies. As a result, throughout the Class Period, the Company's financial statements, and other of Defendants' Class Period misstatements, massively overstated Tingo's assets, revenues, profitability, and business opportunities—thereby artificially inflating the price of Tingo's securities.

6.     The truth about Defendants' fraud was revealed on June 6, 2023, before the market opened, when the investment research firm, Hindenburg Research LLC ("Hindenburg"), issued a scathing report entitled "Tingo Group: Fake Farmers, Phones, and Financials—The Nigerian Empire That Isn't" (the "Hindenburg Report"). The Hindenburg Report shocked investors by disclosing myriad red flags

about the Company and vehemently questioning the legitimacy of Tingo's operations, including by ***explicitly accusing the Company of being a total "scam with completely fabricated results*.**"

7.      For instance, after conducting its own detailed investigation in Nigeria, the Hindenburg Report found that Tingo proclaimed it was building state of-the-art facilities that do not actually exist, purported to have contracts with customer and suppliers who deny ever having heard of Tingo, and claimed to have hundreds of millions of dollars in cash reserves that are unaccounted for.  Accordingly, the Hindenburg Report concluded that the financial results Tingo had disclosed for itself and its Tingo Mobile and Tingo Foods subsidiaries were grossly inflated when compared with those subsidiaries' nonexistent business activities.

8.      In response to this news, Tingo's share price fell $1.23 per share, or over 48%, from closing at $2.55 per share on June 5, 2023, down to $1.32 per share at closing on June 6, 2023.  Additionally, following publication of the Hindenburg Report, all trading of Tingo securities was halted by the SEC, and Tingo's regulators commenced an in-depth investigation of the Company.

9.      On December 18, 2023, the SEC filed a scathing complaint accusing Tingo and Defendant Mmobuosi of engaging in securities fraud and other fraudulent schemes starting as far back as 2019.  Based upon its review of internal Company documents as well as evidentiary materials collected from third parties, the SEC

alleged that "*[f]or years, Mmobuosi and the companies he controls, including Tingo, have intentionally and materially overstated their reported revenues, expenses, profits and assets in their SEC filings, public statements, and the books and records they have provided to their auditors*." The SEC also found that "*Defendants created fake bank statements, falsified general ledgers, and other forged and doctored documents and submitted them to their auditors and others to substantiate their fabricated financial statements*." The SEC further announced that Defendant Mmobuosi "fraudulently obtained hundreds of millions in money or property through these schemes," and *"has siphoned off funds for his personal benefit*[.]"

10.    The SEC's complaint came on the heels of the DOJ's November 15, 2023 indictment of Defendant Mmobuosi for making "material misstatements about the operations and assets of Tingo Mobile and Tingo Foods in an effort to defraud investors including purchasers and sellers of the securities of Tingo," which was unsealed on January 2, 2024. The DOJ's indictment alleges that Defendant Mmobuosi "orchestrated a scheme to enrich himself by falsely representing that Nigerian companies he founded, Tingo Mobile and Tingo Foods, were operational, profitable businesses generating hundreds of millions of dollars in revenue respectively." According to the DOJ, *Defendant Mmobuosi "then looted Tingo[] by misappropriating cash from those companies"* and "is still at large."

11.    Given the damning facts revealed by the Hindenburg Report and further confirmed by these regulatory agencies, in a shocking release Tingo finally was forced to admit to its investors that the Company's consolidated financial statements for its fiscal year 2022 and first quarter of 2023—*the same financial metrics Defendants touted to the market throughout the Class Period*—"*should no longer be relied upon*"—providing yet even further confirmation of Defendants' fraud.

12.    While Defendants unfairly profited from their deception, Lead Plaintiffs and the other members of the putative Class suffered substantial damages as a result of Defendants' fraud.  Lead Plaintiffs bring this action to recover the damages caused by the securities law violations alleged herein.

## II.    JURISDICTION & VENUE

13.    The claims asserted in this complaint arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the SEC, 17 C.F.R. § 240.10b-5.

14.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  At all relevant times, Tingo had its principal place of business in this District and conducts substantial business here. Moreover, many of the acts and transactions alleged herein, including the

dissemination of materially false and misleading statements, occurred in this District.

16.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges and markets.

## III.    PARTIES

### A.    Lead Plaintiffs

17.    Lead Plaintiffs Perdeep Kanda and Pavel Krykhtin, individual shareholders of Tingo as reflected in their PSLRA certifications (ECF No. 31-4), purchased a significant amount of Tingo shares during the Class Period and suffered damages as a result of the misconduct alleged herein.

### B.    Defendants

18.    Defendant Tingo is, and at all times herein mentioned was, a corporation organized and existing under the laws of Delaware, with its principal place of business in this District.  Prior to acquiring Tingo Mobile and Tingo Foods, the Company went by the name MICT.  After acquiring those subsidiaries, on February 24, 2023, the Company changed its name from MICT, Inc. to Tingo Group, Inc.  Tingo's securities traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "MICT," from December 1, 2022 to February 24, 2023, and under the ticker symbol "TIO," from February 27, 2023 until November 14, 2024 when all

trading of Tingo securities was halted by the SEC.  Trading of Tingo's stock never resumed, and on March 1, 2024, the Company's shares were officially delisted from the NASDAQ.

19.    Defendant Mmobuosi was the founder and controller of Tingo Mobile and Tingo Foods, at all relevant times. Defendant Mmobuosi participated in Tingo's earnings calls during the Class Period and made many of the false and misleading statements identified in this Complaint.  After the Class Period ended, Defendant Mmobuosi also served as Tingo's Co-CEO from September to December 2023 when he was forced out after the SEC banned him from operating any public company.

20.    Defendant Darren Mercer ("Mercer") served as a Company director beginning in November 2019 and as the Company's CEO beginning in April 2020 until he resigned from both positions on September 15, 2023.  Defendant Mercer signed Tingo's SEC filings during the Class Period and made certain of the misstatements and omissions alleged herein.

21.    Defendant Kevin Chen ("Chen") served as Tingo's Chief Financial Officer ("CFO") from November 2021 to October 2023 and has served as the Company's Interim CFO since November 2023.  Defendant Chen also signed many of Tingo's SEC filings during the Class Period and made certain of the misstatements and omissions alleged herein.

22.    Defendants Mmobuosi, Mercer, and Chen are sometimes referred to collectively herein as the "Individual Defendants" and, together with Tingo, as the "Defendants."

23.    The Individual Defendants directly participated in the management of Tingo's operations, had direct and supervisory involvement in Tingo's day-to-day operations, and had the ability to control and did control Tingo's financial reporting and other statements to investors.  Thus, the Individual Defendants possessed the power and authority to control the contents of Tingo's SEC filings, press releases, and other market communications during the Class Period.  The Individual Defendants were provided with copies of Tingo's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Tingo, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that their positive representations concerning the Company were materially false and misleading and the times they were made.

## IV.    OVERVIEW OF DEFENDANTS' FRAUD

### A.    Background of MICT and its Acquisition of Tingo Mobile

24.    The Company was originally created in 2002 as Lapis Technologies, Inc., and has since changed its name several times, before rebranding as MICT in 2018.  Before acquiring Tingo Mobile and Tingo Foods, MICT operated as an insurance brokerage and agency business in China and managed an online platform for sales of a wide range of insurance products, including automobile, property and liability, life, and health insurance policies.  MICT's revenues were derived from commissions earned on its sales of insurance policies, as well as from finance fees, insurer marketing fees and through the monetization of the Company's big data technology.

25.    In an effort to "execute [MICT's] growth strategy of building a broader financial services platform[,]" in September 2021, MICT launched Magpie Invest, a proprietary global investment trading platform connected to all major stock exchanges, generating revenues for MICT primarily from stock trading commissions.  This trading platform, however, proved to be unsuccessful.  Desperate to improve its financial results after reporting net losses of over $23 million and $37 million in 2020 and 2021, respectively, MICT began searching for a merger partner.

26.    In 2022, MICT began to negotiate a potential transaction with Tingo Inc.—an over-the-counter ("OTC") traded agri-fintech company operating in Africa

that was affiliated with Defendant Mmobuosi and wholly owned and operated Tingo Mobile.  Tingo Inc. described its operating subsidiary, Tingo Mobile, as "the leading Agri-Fintech platform on the African Continent offering a proprietary technology platform connecting rural farming communities."

27.    Indeed, Tingo Mobile, a private Nigerian company founded by Defendant Mmobuosi, offers its services through the use of smartphones to enable its subscribers (or farmers) to manage their commercial activities.  For instance, Tingo Mobile claims to provide "a 'one stop shop' solution to enable such subscribers to manage everything from airtime top ups, bill pay services for utilities and other service providers, access to insurance services and micro finance to support their value chain from 'seed to sale'."

28.    Tingo Mobile's Nwassa technology platform purports to be a "digital agricultural ecosystem" that allows farmers to sell goods online directly to consumers by providing subscribers with real-time pricing, straight from the farms, eliminating the need for middlemen.  The Nwassa platform purportedly allows farmers to (i) purchase farming inputs, such as fertilizer, seeds, pesticides, tools and equipment; (ii) sell their produce, both directly to consumers and also to wholesalers and food processors, such as Tingo Foods; and (iii) utilize a range of value-added services such as mobile phone airtime and data top-up, insurance, microfinance and bill payment.

29.    Leading up to the merger discussions with MICT, Tingo Mobile claimed to have approximately 9.3 million Nigerian farmer subscribers using its mobile phones and Nwassa platform and reportedly "sustained strong growth" in 2021 of 48% in year-over-year revenues and 63% growth in year-over-year operating income on a proforma basis."    Specifically, Tingo Mobile reported revenue of $865.9 million and operating income of $327.1 million for 2021, compared to $585.3 million in revenue and $201 million of operating income in 2020.    And for the Nwassa platform, Tingo Mobile recorded significant growth of approximately 101%, from $98.6 million in 2020 to $198.6 million in 2021.

30.    On May 10, 2022, MICT announced it executed a merger agreement with Tingo Inc. to acquire Tingo Mobile in order "to create an over $900 million annual revenue and highly profitable Nasdaq-listed Fintech and Agri-Fintech company[.]"  Calling the transaction "transformative for MICT," Defendant Mercer proclaimed that "[u]nder the impressive leadership of its founder and CEO, Dozy Mmobousi [*sic*], Tingo [Mobile] has an incredible and highly profitable impact business, which we believe, with the technology, products and licenses we bring, can accelerate its expansion."

31.    On October 7, 2022, MICT issued another press release touting its acquisition of Tingo Mobile in which Defendant Mercer stated "Tingo has clearly demonstrated its capabilities and technology, and its operating business is now

extremely well positioned to expand globally, including through its upcoming new business streams and product launches." As a result, Defendant Mercer noted the acquisition "will have an immediate material positive impact on the income, earnings and balance sheet of MICT from the date of initial closing."

32.     On December 1, 2022, the first day of the Class Period, the Company announced it had completed its acquisition of Tingo Mobile. In the press release announcing the closing, Defendant Mercer hyped the effects of the transaction to investors, stating:

> ***The completion of this acquisition markedly strengthens our balance sheet and makes us immediately significantly profitable. We therefore expect to report substantial earnings for Q4 2022, followed by material quarter over quarter growth in both revenues and profitability in 2023 and beyond.***

### B.     MICT Acquires Tingo Foods and Becomes Tingo Group Inc.

33.     Tingo Foods, another Nigerian company founded by Defendant Mmobuosi, purports to be a food processing business that turns raw foods into finished products like rice, pasta, and nut products whose mission is to "make Africa's food production self-sufficient and sustainable, by putting farmers at the heart of our story." On February 9, 2023, the Company acquired all of the outstanding shares of Tingo Foods directly from Defendant Mmobuosi, its sole owner. In return, the Company issued to Defendant Mmobuosi a secured promissory

note in the principal amount of $204 million, which purportedly represented the value of Tingo Foods' inventory.

34.    In the press release announcing the acquisition, Defendants claimed that Tingo Foods had "successfully developed a food processing business with a current capacity to process and wholesale more than $1 billion of food produce per annum." The Company also reported that Tingo Foods had generated over $400 million in revenue between its launch in September 2022 and December 31, 2022.

35.    Additionally, Defendants claimed Tingo Foods planned to construct a $1.6 billion "state of the art" food processing facility in Nigeria and held a groundbreaking ceremony that same day. The food processing facility purportedly would enable Tingo Foods "to significantly expand its current product range of rice, millet, cashew nuts and ground nut oil, to also include a wide variety of pastas, noodles, tea, coffee, chocolate, biscuits, cooking oils, non-dairy milks, carbonated drinks, and mineral water, among others."

36.    In describing the acquisition as "a very exciting milestone for MICT's group of companies," Defendant Mercer touted that "***Tingo Foods is expected to add several hundred million dollars of highly profitable revenues to our 2023 results***," while the scheduled launch of the new food processing facility "in the second half of 2024 is expected to result in a multiplication of such revenues and earnings." The Company later announced that Tingo Foods had entered into a

partnership with Evtec Energy Plc ("Evtec"), "which has committed to build a $150 million net zero carbon emission solar plant to provide a sustainable and low-cost energy source to power the facility."

37.    Mere days after the Tingo Foods acquisition, the Company announced it had launched Tingo DMCC, a purported global commodities trading platform and export business based out of the Dubai Multi Commodities Center, hence the acronym DMCC.  Tingo DMCC's website states that it "connects buyers and farmers around the world and provides them with tools, technology, and intelligence to fairly trade with each other while saving cost, increasing profit, and providing affordable prices for end users."  According to Defendants, Tingo DMCC would facilitate the export of agricultural commodities by existing and new customers.

38.    After the closing of the Tingo Foods merger, on February 24, 2023, MICT, Inc. announced that it was changing its name to Tingo Group, Inc. and would change its ticker symbol on the NASDAQ from "MICT" to "TIO."

### C.    Defendants Hyped Tingo's Business Activities and Profitability to Investors Throughout the Class Period

39.    After acquiring Tingo Mobile and Tingo Foods, Defendants repeatedly made materially false and misleading statements concerning Tingo's financial results and business operations, thereby artificially inflating the price of Tingo shares throughout the Class Period.  As a result of Defendants' misstatements, Tingo's

stock price hit a Class Period high of $5.32 on May 19, 2023, after trading for less than $1 for months prior to the acquisition of Tingo Mobile in December 2022.

40.    For instance, in the Company's December 1, 2022 press release announcing the closing of the merger with Tingo Mobile, Defendant Mercer falsely proclaimed that "***Tingo Mobile is already highly profitable and growing strongly***" and also informed the market that, "[w]ithin the past few weeks, Tingo Mobile has delivered a number of major trade deals, ***which [] are expected to result in a more than tripling of current customer numbers***[.]"  As a result of these statements, the Company's stock price increased over 20%, from a closing price of $0.97 on November 30, 2022, to a closing price of $1.17 per share on December 1, 2022.

41.    On March 31, 2023, Tingo filed a Form 10-K for its fiscal year 2022—the Company's first filing incorporating Tingo Mobile's financials into the Company's consolidated financial statement (the "2022 10-K").  In the 2022 10-K, Tingo reported $146,035,000 in annual revenue, of which $88,616,000 was attributed to Tingo Mobile's purported sales and leasing of smartphones, its provision of data and mobile call services to its phone subscriber base, and its customers' Nwassa platform usage.  ***Tingo also reported cash and cash equivalents of $500.3 million as of December 31, 2022, which consisted of $467.1 million purportedly held by Tingo Mobile***.

42.    The 2022 10-K stated that Tingo had "entered into trade partnerships that are ***contracted to increase the number of subscribed farmers from 9.3 million in 2022 to more than 32 million***, providing them with access to services including, among others, the Nwassa 'seed-to-sale' marketplace platform[.]"  The 2022 10-K also highlighted that the Nwassa payment platform "processes approximately $1 billion USD in gross transaction value (GTV) on a monthly basis."

43.    Following the Company's issuance of its 2022 10-K, analysts at Taglich Brothers projected that Tingo's 2023 revenues would be $3 billion, and could reach as high as $5.9 billion by 2024, a drastic increase from 2022 pro-forma revenue of nearly $1.2 billion.  Those analysts also explained that their revenue projections were "predicated on successful implementation of trade deals signed in 4Q22 that should significantly increase Tingo's new customers to at least 30 million entering 2024" and result in "significant transaction growth on TIO's financial technology and services platforms."

44.    Regarding Tingo Foods, the 2022 10-K noted a "***key element of the growth plans for Tingo Foods is the development of its own food processing facility***.  To this end, through a joint venture, Tingo Foods has committed to build and operate a state-of-the-art $1.6 billion food processing facility in the Delta State of Nigeria, which is expected to be completed by the end of the first half of 2024."  This led analysts at Taglich Brothers to conclude that "Tingo Foods should make a

modest contribution to total revenue relative to the company's other operations in 2023[,]" noting that the contribution will "increase rapidly" upon the opening of the Company's food processing facility.

45.     On April 27, 2023, Tingo issued a press release announcing the filing of Tingo Foods 2022 audited financial statements.  In the release, the Company highlighted that in the four-month period from Tingo Foods inception (September 2022 – December 31, 2022), Tingo Foods had generated revenues of $466.2 million, gross profits of $196.4 million, equating to a gross margin of 42.1%, and held $54.8 million in cash and $200.1 million in inventory.  The same press release also quoted Defendant Mmobuosi as saying that he was proud of "***establishing and growing Tingo Foods to be a sizeable and profitable business in such a short space of time, as demonstrated by today's audited results***."

46.     During an investor conference on May 1, 2023, Defendant Mercer once again emphasized that Tingo Foods' processing facility "has the very real potential and capacity to generate multibillion dollars of very profitable revenues per annum once fully operational" and was intended "to supply and satisfy billions of dollars of pent-up demand of exports of processed food each year."

47.     Then, on May 15, 2023, Tingo filed a Form 10-Q for the first quarter of 2023 ("1Q23 10-Q").  The 1Q23 10-Q reported for the first time on Tingo Food's financial results following its acquisition by the Company.  During the earnings

conference call with analysts and investors later that day, Defendant Mmobuosi claimed that "[w]ithin the first four months of trading to December 31, 2022, Tingo Foods generated more than $466.2 million of turnover.  The first quarter of 2023 then saw revenues grow to $577.2 million, generating an operating profit of $143.5 million."

48.    Defendant Mmobuosi also gave an update on the Company's planned food processing facility, highlighting on the earnings call that:

> ***Tingo Foods is set to multiply capacity and revenue with a new state-of-the-art $1.6 billion food processing facility*** in Delta State of Nigeria.  Our joint venture partner is already at an advanced stage of completing work on the building's foundations and the installation of infrastructure, drainage, and water supply and facility is on track to open by mid-2024.

49.    Following the issuance of the Company's 1Q23 10-Q, analysts at Taglich Brothers increased their 2023 and 2024 revenue projections for Tingo to $4.6 billion and $6.9 billion, respectively based on "higher than anticipated contribution from the [C]ompany's Tingo Foods operations[.]"  The analysts noted that their revenue projections were predicated on Tingo Foods generating revenue of $3.3 billion in 2024, up from an estimated $2.4 billion in 2022, highlighting that since the acquisition, "demand for [Tingo Foods] initial five product offerings was substantial."  In addition, the analysts anticipated significant revenue contribution from Tingo's DMCC, which they "expected to generate at least $1 billion revenue [in 2023] and likely increase to approximately $2 billion in 2024."  In reliance on

Defendants' false statements, Tingo's stock price increased nearly 17%, from closing at $2.90 per share on May 12, 2023, to closing at $3.39 per share on May 15, 2023. Shortly thereafter Tingo's stock price reached its Class Period high of $5.32 per share on May 19, 2023.

50.     Then, on May 30, 2023, the Company announced Tingo DMCC's first export sales in the amount of $348 million, emphasizing that "[t]he sales completed today are part of an anticipated long-term multi-billion-dollar pipeline of export transactions, more than $1 billion of which are currently being processed for expected delivery by the third quarter of 2023."

51.     However, as detailed below, all of these statements by Defendants were false when made because the vast majority of Tingo's reported revenues and alleged business activities were completely fictitious, as both Tingo Mobile and Tingo Foods were always sham companies without any legitimate business operations.

### D.     The Hindenburg Report Reveals Tingo as a "Brazen Fraud"

52.     On June 6, 2023, the truth about Defendants' pervasive fraud was fully revealed to the market via the before markets opened publication of the Hindenburg Report, titled "Tingo Group: Fake Farmers, Phones, and Financials—The Nigerian Empire That Isn't."

53.     The Hindenburg Report was highly critical of both Tingo and Defendant Mmobuosi individually, concluding that after conducting a wide-ranging

investigation in Nigeria "***we believe the company is an exceptionally obvious scam with completely fabricated financials***."  Indeed, the Hindenburg Report detailed myriad "red flags" uncovered by its investigation that revealed Defendant Mmobuosi to be a career criminal and caused its authors to question the legitimacy of Tingo's purported business operations.  The shocking revelations contained in the Hindenburg Report demonstrated to investors that all of Defendants' statements about the successes of Tingo's various business segments, including Tingo Foods, Tingo Mobile, the Nwassa platform, and Tingo DMCC, must not have been true.

54.    Specifically, the Hindenburg Report disclosed that, although Mmobuosi routinely claimed to be "a successful billionaire entrepreneur[,]" in reality, he was a seasoned criminal who had wholly fabricated his educational and professional background.  For instance, while Defendant Mmobuosi "claimed to have received a PhD in rural advancement from a Malaysian university in 2007[]" in the biography he posted on Tingo's company website, when the Hindenburg Report's authors "contacted the school to verify the degree" the school disclosed that "no one by his name was found in their verification system."  Additionally, while Defendant Mmobuosi had repeatedly claimed in various media that he had personally developed the first mobile payment app in Nigeria, the Hindenburg Report's authors "contacted the app's creator, who called Dozy's claims 'a pure lie'" in a detailed "WhatsApp post he wrote to Nigeria's top fintechs and regulators[.]"

Finally, upon contacting the Nigerian Economic and Financial Crimes Commission, the Hindenburg Report disclosed that ***Defendant Mmobuosi had been arrested in 2017 and was facing "an 8-count indictment over issuance of bad checks***[,]" but had subsequently "settled the case in arbitration."

55.    Significantly, the Hindenburg Report also revealed information evidencing that Tingo's alleged business operations and revenues were vastly overstated.  For example, Tingo Mobile's supposed profitability was built on the falsehood that it had tens of millions of subscribers.  However, at no point did Tingo Mobile in fact have anywhere close to even 9.3 million subscribers, as ***the farming cooperatives Defendants identified as Tingo's two primary mobile subscribers denied ever having heard of, let alone having worked collectively with, Tingo Mobile and were comprised of merely hundreds rather than the supposedly millions of farmers***.  Specifically, the Hindenburg Report reported that, when contacted by another media outlet in connection with a similar inquiry, representatives of each of these farming cooperatives conveyed "'they had never heard of Tingo, nor did they have millions of farmers under their organization[.]'" Similarly, after speaking with representatives of both companies, the Hindenburg Report revealed that neither UGC Technologies Company ("UGC")[2] nor Bullitt

---

[2] Tingo's financial statements have used multiple different names referring to the supposed UGC entity, including by referring to it as "UGC Technologies China," "UGC Technologies," and "UGC Technologies Limited."

Mobile Limited ("Bullitt")—Tingo Mobile's asserted "'sole suppliers of mobile phones'" as of the Company's 2022 fiscal year end—had ever provided any phones to Tingo, stating: "'We Do Not Provide Even A Single Unit To Them[.]'" Additionally, the Hindenburg Report found that the Nwassa platform's website was never fully developed or operational, and only listed a few products with no reviews or ratings throughout the Class Period.

56.    Regarding Tingo Foods, the Hindenburg Report described how the Company proclaimed that: (1) Tingo's food division claimed 24.8% operating margins, which "exceed those of every major comparable food company"; (2) the rendering of Tingo's planned $1.6 billion Nigerian food processing facility, featured in Tingo's investor materials and on a billboard at the ceremony, is actually a rendering of an oil refinery from a stock photo website; (3) Tingo Foods' supposed joint venture partner, Evtec Energy Plc, who Defendants claimed had agreed to build solar panels for Tingo Foods' supposedly forthcoming food processing facility actually had no cash on hand and was dormant as of its 2022 annual report according to Evtec Energy Plc's UK filings; (4) despite Tingo's representations of "significant progress" on the facility, including laying "the foundations of its numerous buildings[,]" Hindenburg's investigators "visited the site a week later and found zero signs of progress; it was empty except for the plaque and billboard commemorating the groundbreaking ceremony, surrounded by weeds"; and (5) the reportedly $204

million worth of Tingo Foods inventory the Company had paid for when acquiring Tingo Foods at the end of February 2023 had somehow completely vanished from Tingo's consolidated financial statements for the first quarter of 2023 without explanation.

57.     Regarding Tingo DMMC, despite Defendants' claims that Tingo's brand-new agricultural export business was on track to deliver over $1.34 billion in exports by the third quarter of 2023, the Hindenburg Report revealed that no import/export records for Tingo existed when investigators searched Nigerian customs and trading databases.  Significantly, Defendants' promises were simply not possible given that their projections that Tingo DMMC would generate over $1.34 billion in exports were higher than the entire nation of Nigeria's annual agricultural exports, which totaled about $1.15 billion in 2022.

58.     The Hindenburg Report reached a scathing conclusion: "***Tingo is a worthless and brazen fraud that should serve as a humiliating embarrassment for all involved.***  We do not expect the company will be long for this world."

59.     The Hindenburg Report bears all the hallmarks of a credible analyst report.  Indeed, the Hindenburg Report purportedly was based on an independent investigation that included visits to Nigeria to examine Tingo's claims, interviews with Tingo's supposed business partners, and review of documentary evidence that directly contradicted the Company's misstatements.  And the market clearly credited

the Report's revelations, as Tingo's stock price fell $1.23 per share, or over 48%, from a closing price of $2.55 per share on June 5, 2023 to a closing price of $1.32 per share on June 6, 2023 following its publication.

60.    Subsequently, on November 13, 2023, the SEC suspended trading of Tingo stock for ten business days, beginning November 14, 2023, because of "questions and concerns regarding the adequacy and accuracy of publicly available information in the marketplace" concerning, among other things, the financial statements and operations of Tingo Mobile and Tingo Foods.  On November 28, 2023, following the automatic expiration of the SEC's trading suspension, the NASDAQ initiated its own trading halt of Tingo's shares, which continued until March 1, 2024, when Tingo was officially delisted as a public company on the NASDAQ.

### E.    Post-Class Period Events Confirm Defendants' Statements Were False and the Company's Business Was Fabricated

61.    The extent of Defendants' massive fraud first revealed via publication of the Hindenburg Report has been further confirmed by numerous post-Class Period events each of which corroborates that Defendants' Class Period statements concerning Tingo's business activities and financial results indisputably were materially false and misleading at the times they were made.

### 1. The SEC Finds Defendants' Fraud "Staggering" and Forever Bans Defendant Mmobuosi from Operating a Public Company

62.    In the wake of the Hindenburg Report's publication on June 6, 2023, the SEC issued multiple investigative subpoenas to Tingo in response to which Defendants produced internal Company documents.    After conducting its investigation, including a review of Tingo's produced materials, the SEC filed a biting complaint against Defendants Tingo and Mmobuosi on December 18, 2023. In that complaint, the SEC charged those Defendants with violating the anti-fraud provisions of the federal securities laws based on allegations that Defendants had "intentionally and materially overstated their reported revenues, expenses, profits and assets in their SEC filings, public statements, and the books and records they have provided to their auditors."  The SEC's complaint further details how for years Tingo had booked billions of dollars' worth of fictitious transactions by Tingo Mobile and Tingo Foods, reporting hundreds of millions of dollars of non-existent revenues and assets, thereby creating the false impression that Tingo was a thriving, multimillion-dollar business when in reality it wasn't.[3]

---

[3] On August 28, 2024, Judge Jesse M. Furman of the Southern District of New York issued an order in the SEC Action entering a Final Judgment by Default against all defendants, including Defendants Tingo and Mmobuosi, given their continuous refusal to appear in and defend themselves against that Action.  *See* ECF No. 69.  In the Final Judgment by Default, Defendant Mmobuosi, along with the companies the founded, were ordered jointly and severally to pay disgorgement of almost $190

63.     The SEC's investigation discovered that Defendants perpetrated this fraud by creating fake bank statements, falsified general ledgers, and other forged and doctored documents and submitting them to their auditors and others in attempt to substantiate Tingo's fraudulent financial statements.   For example, the SEC revealed that Defendants concealed their fraud by buying and registering internet domain names in the names of their made-up suppliers and customers; they then used email addresses from these domains to pose as these entities' representatives in sending Company auditors confirmation of the entities' reported balances with Tingo.   The tables below, derived from the SEC's complaint, show the massive discrepancies between Tingo Mobile's fake bank statements provided to its auditors and its actual bank statements for the same bank accounts for the 2022 calendar year and for the first five months of 2023:

| 2022 | Fictitious Bank Records | Actual Bank Records | Difference | Percentage Overstated |
|---|---|---|---|---|
| Opening Balance | $125,221,594.67 | $3,882.02 | $125,220,017.65 | 3,224,297% |
| Credits | $1,618,200,651.88 | $2,854,686.37 | $1,615,345,965.51 | 56,563% |
| Debits | $1,537,439,467.05 | $2,858,555.11 | $1,534,580,911.94 | 53,662% |
| Closing Balance | $206,053,534.23 | $13.28 | $206,053,520.95 | 1,550,455,495% |

---

million, among other civil monetary penalties, and Defendant Mmobuosi was ordered to disgorge for cancellation the $204,000,000.00 promissory note Defendant Mmobuosi received from the sale of Tingo Foods to Defendant Tingo, among other things.

| 2023 (Jan-May) | Fictitious Bank Records | Actual Bank Records | Difference | Percentage Overstated |
|---|---|---|---|---|
| Opening Balance | $194,926,233 | $13 | $194,926,220 | 1,550,455,495% |
| Credits | $584,773,051 | $148,963 | $584,624,088 | 392,463% |
| Debits | $65,996,642 | $148,956 | $765,847,686 | 514,145% |
| Closing Balance | $8,311,128 | $19 | $8,311,108 | 42,922,273% |

64.     As the Hindenburg Report had previously surmised, the SEC likewise discovered that these numbers were made of whole cloth and did not reflect Tingo actual revenues, profits or cash balances, which in fact were negligible.  The SEC's complaint alleged, for instance, that while Tingo's 2022 10-K "filed in March 2023 reported a cash and cash equivalent balance of $461.7 million residing in Tingo Mobile's Nigerian bank accounts[,]" *the Company's "[a]uthentic bank records for the same accounts [] show[ed] a balance of less than $50 for that period."*

65.     The SEC's complaint further noted that the fictitious bank statements and ledgers Tingo Mobile provided to Tingo's auditors reported several sizeable handset sales and leasing payments between 2021 and 2023 from its supposed two primary farming cooperative customers, but Tingo Mobile's actual bank statements show that the Company has *never* received any payments from either of them, confirming the information revealed by the Hindenburg Report concerning these same two cooperatives.  Similarly, consistent with allegations in the Hindenburg Report, the SEC's investigation showed that Tingo *never* made a single payment to

UGC; **never** made any payments to Bullitt; and to this day, has **never** received a single phone from either supplier, notwithstanding Defendants' contrary representations.

66.    Finally, Tingo claimed to its auditors that revenues from its customers' use of the Nwassa platform were received, processed and recorded in its bank statements through its payment gateway, "Paystack."  Indeed, the SEC's complaint notes that Tingo's fictitious bank statements and general ledger reflect Tingo receiving $245 million from "Internal Transfers – Paystack" during 2021 and $641 million from "Paystack Airtel" during 2022.  Though, as discovered by the SEC's investigation, Tingo's actual bank statements show that Tingo has **never** received any payments from Paystack or Paystack Airtel.

67.    Regarding Tingo Foods, the SEC's complaint alleged "Mmobuosi replicated the Tingo Mobile fraudulent scheme with [Tingo Foods,]" thereby compounding the fraud.  For example, the SEC's investigation revealed that despite Defendants' claim that the subsidiary carried a cash balance of around $54 million as of 2022, authentic bank statements show that ***Tingo Foods did not even open its bank account until February 2023, and thereafter maintained a balance of only about $100 for the duration of the Class Period***.

68.    The SEC's investigation also found that "Mmobuosi knowingly, or with reckless disregard, caused Tingo['s] [] fictitious transactions to be recorded in

those companies' books and records and reported in their SEC filings, press releases, investor presentations and other public disclosures, many of which Mmobuosi made and/or certified[,] rendering those public representations materially false and misleading and causing significant, artificial overvaluation of the companies' shares and Mmobuosi's controlling stake in them."

69.    Accordingly, in its complaint the SEC sought "emergency relief to prevent Defendants' continued dissemination of materially false information to investors and to protect corporate and investor assets from Defendants' further dissipations" and to "***permanently prohibit Defendant Mmobuosi from serving as an officer or director of any [publicly-traded] company" or "participating in the issuance, purchase, offer or sale of any security***."  Finally, the SEC also sought a judgment "ordering Defendants to disgorge all ill-gotten gains[.]"

70.    To that end, on December 19, 2023, the SEC issued a press release announcing that it had obtained a temporary asset freeze, restraining order, and other emergency relief against Defendants Tingo and Mmobuosi.

71.    Following the revelation of the SEC's charges against Defendant Mmobuosi, on December 20, 2023, Tingo issued a press release announcing that Defendant Mmobuosi stepped down as Co-CEO of Tingo "in connection with the order sought by the [SEC] to prohibit Mmobuosi from acting as an officer or director of a public company."

### 2. Defendants Are Forced to Admit that Tingo's Financial Statements "Should No Longer Be Relied Upon"

72.    On December 26, 2023, Tingo filed an 8-K acknowledging the filing of the SEC's complaint and the seriousness of its allegations, and in which Defendants made a simply stunning admission.  Specifically, in that 8-K, Tingo finally had to admit to investors that the financial statements the Company filed with the SEC throughout the Class Period "*should no longer be relied upon*":

> As previously disclosed by Tingo Group, Inc. (the "Company"), on December 18, 2023, the Securities & Exchange Commission ("SEC") filed a complaint against the Company alleging that its Financial Statements have been fabricated since at least 2019.  On December 23, 2023, based on the complaint and the evidence in the SEC exhibits which contradicts certifications, representations and evidence previously provided by the Company and its management, ***the Audit Committee concluded that the Company's consolidated financial statements for 2022*** included in the Company's Annual Report on Form 10-K for the year ended December 31, 2022 and associated report of the Company's independent registered public accounting firm, Brightman Almagor Zohar & Co. ("Deloitte Israel"), ***as well as the Company's consolidated financial statements for the first quarter of 2023*** included in the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 2023, its consolidated financial statements for the second quarter of 2023 included in the Company's Quarterly Report on Form 10-Q for the six and three months ended June 30, 2023 and its consolidated financial statements for the third quarter of 2023 included in the Company's Quarterly Report on Form 10-Q for the nine and three months ended September 30, 2023 ***and the financial statements of Tingo Foods PLC*** for the period from August 11, 2022 (inception) to the year ended December 31, 2022 and associated report of Deloitte Israel included in Form 8-K/A dated April 27, 2023 ***should no longer be relied upon.***

### 3.    The DOJ Indicts Defendant Mmobuosi

73.    On January 2, 2024, the DOJ, along with the Federal Bureau of Investigation ("FBI"), announced the unsealing of a November 15, 2023 indictment charging Defendant Mmobuosi with securities fraud, making false filings with the SEC, defrauding Tingo's auditors and engaging in an illegal conspiracy.   The allegations in the indictment further confirm the negative information about Defendants revealed in the Hindenburg Report and subsequently corroborated by the SEC.   Indeed, the DOJ's indictment asserts that from at least 2019:

> *Mmobuosi orchestrated a scheme to enrich himself by falsely representing that Nigerian companies he founded, Tingo Mobile and Tingo Foods, were operational, profitable businesses generating hundreds of millions of dollars in revenue respectively.*
>
> *         \*         \*         \**
>
> *As a result, Mmobuosi caused Tingo [] to issue financial statements that falsely portrayed Tingo Mobile and Tingo Foods to be cash-rich, revenue-generating companies when, in fact, they were not. Mmobuosi then looted Tingo [] by misappropriating cash from those companies* and engaged in well-timed sales of their shares at inflated prices, generating millions of dollars of profits from his scheme.

74.    The DOJ charged Defendant Mmobuosi with making "material misstatements about the operations and assets of Tingo Mobile and Tingo Foods in an effort to defraud investors including purchasers and sellers of the securities of Tingo."   The DOJ found that Defendant Mmobuosi caused Tingo to file "with the SEC quarterly filings on Form 10-Q, press releases on Form 8-K, and annual reports

on Form 10-K… which omitted material facts and contained materially misleading statements."

75.    In the press release announcing the unsealing of the indictment, Damian Williams, the U.S. Attorney for the Southern District of New York stated: "***Dozy Mmobuosi allegedly orchestrated a massive scheme to inflate Tingo's[] financial statements and make it appear as though the cellular and agriculture companies he founded were profitable and cash rich companies when, in fact, they were not***." Defendant Mmobuosi has subsequently fled from authorities and presently remains a fugitive "at large."

### 4.    Tingo's Auditor Resigns

76.    On January 22, 2024, Tingo filed another 8-K, reiterating that Tingo's Class Period financial disclosures "should no longer be relied upon."  The 8-K also announced that Tingo's auditor, Deloitte Israel, had resigned on January 16, 2024 because it could "***no longer be able to rely on management's representations,***" and was "***unwilling to be associated with the financial statements prepared by management***":

> As disclosed in the Company's 8-K filed on December 26, 2023, following the Securities and Exchange commission ("SEC") complaint against the Company filed on December 18, 2023, the audit committee determined on December 23, 2023, based on the complaint and the evidence in the SEC exhibits which contradicts certifications, representations and evidence previously provided by the Company and its management, that ***the Company's consolidated financial statements for 2022 included in the Company's Annual Report on Form 10-K***

*for the year ended December 31, 2022 and associated report of the Company's independent registered public accounting firm, Deloitte Israel, should no longer be relied upon.*

*   *   *

*Deloitte Israel has advised the Company that information contained in the SEC complaint and other documents filed by the SEC on December 18, 2023 and the Department of Justice sealed indictment filed on November 15, 2023 which was unsealed on January 2, 2024, has led it to no longer be able to rely on management's representations, and has made it unwilling to be associated with the financial statements prepared by management.*

77.    In sum, after investigating Defendants and their sham businesses, both the SEC and DOJ effectively found that Defendants "intentionally and materially overstated their reported revenues, expenses, profits and assets in their SEC filings, public statements, and the books and records they have provided to their auditors," Tingo's auditor asserted it was "unwilling to be associated with the financial statements prepared by management," and the Company itself disclosed that Defendants representations concerning Tingo's finances "should no longer be relied upon." Given these damning facts, Defendants will be hard pressed to credibly establish they did not know, or at least recklessly disregard, the blatant falseness of their Class Period misstatements.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

78.    During the Class Period, Defendants made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Exchange Act

35

and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements and omissions concerning Tingo's business operations, financial results, and future prospects.

79. As discussed above and further detailed below, Defendants' representations were false and misleading when made, and omitted material facts necessary to make Defendants' statements not misleading. These material misstatements and omissions had the effect of creating in the market an unrealistically positive assessment of Tingo's business, operations, and associated finances. In truth, Defendants knew all along but never disclosed that: (1) Tingo routinely overstated its revenue and other accounting metrics, creating a false impression of the Company's finances; (2) Tingo was not meaningfully engaged in many of the business activities that it claimed had been profitable and would continue to drive future growth; (3) many of the Company's supposed contracts with customers and suppliers did not exist; and (4) in light of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### A.    December 1, 2022 – MICT Acquires Tingo Mobile

80. The Class Period begins on December 1, 2022, when the Company closed its acquisition of Tingo Mobile from Tingo Inc. On that date, the Company

(at the time still branded MICT, Inc.) and Tingo Inc. issued a joint press release in

which Defendant Mercer fraudulently represented:

> We firmly believe we have acquired one of the world's most exciting agri-fintech and fintech businesses.  As reported in Tingo's Q3 results, ***Tingo Mobile is already highly profitable and growing strongly. Within the past few weeks, Tingo Mobile has delivered a number of major trade deals, which not only are expected to result in a more than tripling of current customer numbers***, but also marks the commencement of its global expansion.
>
> ***The completion of this acquisition markedly strengthens our balance sheet and makes us immediately significantly profitable***.  ***We therefore expect to report substantial earnings for Q4 2022, followed by material quarter over quarter growth in both revenues and profitability in 2023 and beyond***.

81.    The joint press release also quoted Defendant Mmobuosi as stating:

> Today's merger is enabling us to accelerate upon our ambitious global expansion strategy, which in turn is already beginning to dollarize our business, a trend that is expected to continue and grow throughout 2023 and beyond.
>
> The mutual benefits brought to each party by this transaction are already making material differences to the enlarged group.  I remain very excited about the abundance of opportunities we have for Tingo Mobile and MICT, both in our immediate and long-term future.

82.    The statements in ¶¶80–81 were materially false and misleading, and

omitted material facts when made, because Tingo Mobile was ***not*** highly profitable

or growing strongly and had ***not*** delivered on trade deals, nor did MICT's acquisition

of Tingo Mobile strengthen the Company's balance sheet or make Tingo

significantly profitable.  Rather, as set forth in the Hindenburg Report, and

subsequently confirmed by the SEC and DOJ and Tingo's own post-Class Period

admissions, Tingo Mobile's supposed profitability was built on the falsehood that it had millions of subscribers when in reality it did not, and the trade deals referenced in Defendant Mercer's statement were completely fabricated.

### B. March 31, 2023 – Fiscal Year 2022 Results

83. On March 31, 2023, Tingo filed its 2022 10-K for fiscal year 2022, which was signed by Defendants Mercer and Chen. In the 2022 10-K, Defendants reported $146,035,000 of consolidated annual revenue, of which $88,616,000 was attributed to Tingo Mobile's purported sales and leasing of smartphones, its provision of data and mobile call services to its phone subscriber base, and its customers' Nwassa usage. Tingo also reported cash and cash equivalents of $500.3 million as of December 31, 2022, which consisted of $467.1 million purportedly held by Tingo Mobile in that filing.

84. During the earning conference call Tingo held the same day, Defendant Mmobuosi claimed that "[w]ithin the first four months of trading, Tingo Foods generated more than $400 million of turnover at healthy margins."

85. Additionally, on March 31, 2023, Tingo filed a Form 8-K with the SEC, which was signed by Defendant Mercer, attaching the investor presentation the Company provided on its earnings call. The 8-K similarly stated that "Tingo Foods generated more than $400 million of high-margin revenue in first 4 months (Sep 2022 – Dec 2022)."

86.    The statements in ¶¶83-85 were materially false and misleading, and omitted material facts when made, because as set forth in the Hindenburg Report, and subsequently confirmed by the SEC, DOJ, Tingo's independent auditor, and Tingo's own post-Class Period admissions, Tingo's financial statements were completely fabricated and "should no longer be relied upon."  Instead, the purported revenues and other financial metrics Defendants reported in the 2022 10-K were based upon falsified bank statements and a doctored general ledger.  For instance, Tingo's cash and cash equivalents were materially overstated as Tingo Mobile's actual cash balance at that time was less than $6,000.  Moreover, Tingo Foods did not generate more than $400 million dollars (or any money) in its first four months of existence, as Tingo Foods did not even have a real bank account during this period and its purported revenues were entirely fabricated.

87.    In discussing Tingo Mobile, the 2022 10-K further stated that Tingo had "entered into trade partnerships that are contracted to increase the number of subscribed farmers from 9.3 million in 2022 to more than 32 million, providing them with access to services including, among others, the Nwassa 'seed-to-sale' marketplace platform, insurance, micro-finance, and mobile phone and data top-up."  The 2022 10-K explained that "[e]ach of [Tingo Mobile's] current subscribers is a member of one of a small number of cooperatives with whom a subsidiary of Tingo

has a contractual relationship, which facilitates the distribution of Tingo-branded smartphones into the various rural communities of user farmers/agri-workers."

88.    During the accompanying earnings conference call, Defendant Mmobuosi claimed:

> In November and December [2022], we signed trade agreements with two major partners with the aim of quickly expanding Tingo Mobile's customer base from 9.3 million farmers to an expected 30 million by the end of 2023.  We signed a trade partnership with the All Farmers Association of Nigeria, which included a commitment to enroll a minimum of 20 million new customer base to Tingo Mobile.

89.    The 2022 10-K also discussed a purported agreement with Airtel, a Nigerian mobile network provider, stating that "[t]hrough a Mobile Virtual Network agreement with Airtel, Tingo Mobile provides its customers in Nigeria with voice and data services."

90.    And regarding the supply of mobile phones, the 2022 10-K stated,

> In March 2020, Tingo Mobile entered into a mobile phone procurement contract with UGC Technologies Company Limited, with located in Shenze Town, China.  In January 2022, Tingo Mobile entered into an agreement with Bullitt Mobile Limited, based in Reading, England, who are a supplier of branded cellular telephone products and accessories . . .. UGC Technologies Company Limited and Bullitt Mobile Limited are [Tingo's] sole suppliers of mobile phones at present.

91.    The statements in ¶¶87-90 were materially false and misleading, and omitted material facts when made, because Tingo Mobile did not have anywhere close to 9.3 million subscribers and, thus, could not reasonably "expect[] 30 million

by the end of 2023," nor did Tingo's claimed relationships with customers and supplies actually exist. Instead, as set forth in the Hindenburg Report, and subsequently confirmed by the SEC, the DOJ and Tingo's own post-Class Period admissions, the farming cooperatives whose members Defendants claimed were Tingo Mobile subscribers, had only a few hundred members, not 9.3 million or more, and denied ever having heard of or worked with Tingo. Moreover, Tingo Mobile did not have contractual agreements with Airtel or UGC, as spokespersons for each confirmed no such contracts existed. And, while Bullitt stated it had signed a contract to provide Tingo Mobile with phones in the future, Bullitt representatives likewise confirmed Bullitt has *never* actually supplied Tingo Mobile with any phones. Finally, the Nigerian Communications Commission has no record of Tingo being a mobile licensee.

92. In addition, the 2022 10-K describes the Company's Nwassa Platform as "Africa's leading digital agriculture ecosystem[,]" which works as follows:

> Using Tingo Mobile's ecosystem, farmers can ship produce from farms throughout Nigeria, in both retail and wholesale quantities. Tingo Mobile's system provides real-time pricing, straight from the farms, which eliminates middlemen. The customers of Nwassa users pay for produce bought using available pricing on the platform.

93. The 2022 10-K also made note that as of December 31, 2022, "Tingo Mobile had approximately 9.3 million subscribers using its mobile phones and

Nwassa payment platform[,]" and that "the [Nwassa] platform processes approximately $1 billion USD in gross transaction value (GTV) on a monthly basis."

94.    The statements in ¶¶92-93 were materially false and misleading, and omitted material facts when made, because the Nwassa platform was *not* operational and thus could not have been utilized in the manners Defendants claimed. Rather, according to the Hindenburg Report, the Nwassa platform's website was under maintenance and had been for months during the Class Period. Indeed, archives of the platform reveal that it was *never* fully developed and listed just a few products with no reviews or ratings. As such, the revenue and GTV numbers were false and misleading because the Nwassa platform was not capable of processing transactions during the time the statements were made.

95.    Regarding Tingo Foods, the 2022 10-K highlighted the alleged development of a $1.6 billion food processing facility in Nigeria, stating:

> *A key element of the growth plans for Tingo Foods is the development of its own food processing facility*. To this end, through a joint venture, Tingo Foods has committed to build and operate a state-of-the-art $1.6 billion food processing facility in the Delta State of Nigeria, which is expected to be completed by the end of the first half of 2024 . . . . Tingo Foods has entered into a partnership with a third party company in the UK, Evtec Energy Plc, who have committed to fund and build a $150 million net zero carbon emission solar plant, to provide a sustainable and low-cost energy source to power its multi-billion dollar food processing facility.

96.    The statements in ¶95 were materially false and misleading, and omitted material facts when made, because the Company was *not* attempting to build

its so-called "state-of-the-art" food processing facility.  Indeed, Tingo had not even begun preparing the food processing facility site for operations, as the Hindenburg Report revealed that its authors "visited the site [on May 24, 2023] and found zero signs of progress; it was empty except for the plaque and billboard commemorating the groundbreaking ceremony, surrounded by weeds" and Evtec Energy Plc, Tingo Foods supposed joint venture partner, had no cash on hand and at the time was a dormant company.

97.    Furthermore, accompanying Tingo's 2022 10-K, which contained materially false and misleading statements as alleged above, Defendants Mercer and Chen executed certifications pursuant to Sarbanes-Oxley Act of 2002 ("SOX") Section 302 attesting to the accuracy of that filing.  Specifically, in their SOX certifications for the 2022 10-K, Defendants Mercer and Chen attested that (1) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" (2) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Tingo] as of, and for, the periods presented in this report;" and (3) Defendants Mercer and Chen disclosed to Tingo's auditors and Board of Directors "[a]ny fraud, whether or not material, that involves

management or other employees who have a significant role in the [Company's] internal control over financial reporting."   The SOX certifications signed by Defendants Mercer and Chen also warranted, pursuant to Section 906, that the "[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

98.   By signing SOX these certifications, Defendants Mercer and Chen evidenced their access (and purported review of) Tingo's operations as well as the materially false and misleading statements set forth above.   However, based on the allegations set forth above, it is apparent that such a review would have uncovered the fact that many of the Company's claims about its purported assets, revenues, expenses, customers and suppliers were false.   Indeed, following the SEC's investigation, Tingo admitted that its 2022 year-end financial report included in the 2022 10-K "should no longer be relied upon."

### C.   April 27, 2023 – Tingo Foods Audited Financials

99.   On April 27, 2023, Tingo filed a post-acquisition Form 8-K/A with the SEC, which contained audited financial statements for Tingo Foods as of December 31, 2022 and for the period from August 11, 2022 (inception) to the year ended December 31, 2022.   The financial statements reported that in its first four months of operations, Tingo Foods generated revenues of $466.2 million, gross profits of

$196.4 million, equating to a gross margin of 42.1%, and held over $54 million in cash and $200.1 million in inventory.

100.   In a press release filed that same day, Defendant Mercer highlighted that the inclusion of Tingo Food's financials "*will have an immediate and significant impact on our group revenues and profitability*" and further stated:

> *The recently announced pro forma consolidated financial information* of Tingo and Tingo Mobile Limited, which reflected pro forma consolidated revenues of $1.152 billion and gross profit of $675 million, combined with today's Deloitte [Israel] audited results of Tingo Foods Plc for the four months to December 31, 2022 *demonstrates both the financial strength of the Company and its impressive rate of growth*.

101.   In addition, Defendant Mmobuosi was quoted in the press release as stating he was "extremely proud of our success in establishing and growing Tingo Foods to be a sizeable and profitable business in such a short space of time, as demonstrated by today's audited results."

102.   The statements in ¶¶99-101 were materially false and misleading, and omitted material facts when made, because as set forth in the Hindenburg Report, and subsequently confirmed by the SEC, DOJ, Tingo's independent auditor, and Tingo's own post-Class Period admissions, Tingo's financial statements were completely fabricated and "should no longer be relied upon." In reality, Tingo Foods had *not* generated more than $400 million dollars (or any money) in its first four months of existence, as Tingo Foods did not even have a real bank account during

45

this period and its purported revenues were entirely fabricated. Furthermore, the auditor of these financial statements, Deloitte Israel, abruptly resigned because information contained in the SEC's complaint and DOJ's indictment, "***has led it to no longer be able to rely on management's representations, and has made it unwilling to be associated with the financial statements prepared by management.***"

### D.    May 1, 2023 – Taglich Brothers Investment Conference

103.    On May 1, 2023, Defendant Mercer gave a presentation to investors on behalf of Tingo at the Taglich Brothers 19th Annual Investment Conference. The slide deck, which was filed as an attachment to a Form 8-K filed with the SEC on the same date, highlighted the "New state-of-the-art $1.6 billion food processing facility set to multiply capacity and revenue – scheduled to open mid-2024." The slide deck included a photograph of a purported rendering of the proposed facility:



104.    During the conference call, Defendant Mercer emphasized that the food processing facility "has the very real potential and capacity to generate multibillion

dollars of very profitable revenues per annum once fully operational.  And equally as important, the new facility will provide the opportunity in Africa alone to supply and satisfy billions of dollars of pent-up demand of exports of processed food each year."

105.   The statements in ¶¶103-104 were materially false and misleading, and omitted material facts when made, because the Company was ***not*** attempting to build its so-called "state-of-the-art" food processing facility, and thus would ***not*** "generate multibillion dollars of very profitable revenues" per year.  Indeed, Tingo had not begun preparing the food processing facility site for operations, as the Hindenburg Report revealed that its authors "visited the site [on May 24, 2023] and found zero signs of progress; it was empty except for the plaque and billboard commemorating the groundbreaking ceremony, surrounded by weeds."

106.   Further, the rendering of the facility included in the May 1, 2023 slide deck was actually a stock photo of an oil refinery that was available for purchase online since 2018, and currently licenses for $299[4]:

---

[4] https://www.artstation.com/marketplace/p/0wv3/a-large-complete-refinery.



107.    Finally, Evtec Energy Plc, Tingo Foods supposed joint venture partner, had no cash on hand and at the time was a dormant company.

**E.    May 15, 2023 – First Quarter 2023 Results**

108.    On May 15, 2023, Tingo filed its 1Q23 10-Q for the quarterly period ended March 31, 2023 ("1Q23 10-Q"), which was signed by Defendants Mercer and Chen.  The 1Q23 10-Q stated that Tingo Foods' net revenue from February 9, 2023 through March 31, 2023 was $577,219,000, while its net profits for the same period were $143,445,000.   The 1Q23 10-Q also reported $851,245,000 in quarterly revenue, of which $830,685,000 was attributed to Tingo Mobile's purported sales and leasing of smartphones, its provision of data and mobile call services to its phone subscriber base, and its customers' Nwassa platform usage, as well as Tingo Foods' food processing contracts.

109.    During the accompanying earnings conference call with analysts and investors later that day, Defendant Mmobuosi highlighted again that "[w]ithin the

first four months of trading to December 31, 2022, Tingo Foods generated more than $466.2 million of turnover.  The first quarter of 2023 then saw revenues grew to $577.2 million, generating an operating profit of $143.5 million." Also on the call, Defendant Chen reported "Nwassa platform revenues of $125.3 million" for the first quarter of 2023.

110.    Also on May 15, 2023, Tingo filed a Form 8-K announcing its quarterly earnings, which was signed by Defendant Mercer, and attached the investor presentation it provided on its earnings call.  The investor presentation reported falsely that "Tingo Foods generated more than $400 million of high-margin revenue in first 4 months (Sep 2022 – Dec 2022) … [and] [g]rew revenues to $577.2 million for [the first quarter of 2023] and operating profit to $143.5 million."  The slide deck also listed that the Nwassa platform's revenue for the first quarter of 2023 was $125.3 million.

111.    The statements in ¶¶108-110 were materially false and misleading, and omitted material facts when made, because as set forth in the Hindenburg Report, and subsequently confirmed by the SEC, DOJ, Tingo's independent auditor, and Tingo's own post-Class Period admissions, Tingo's financial statements were completely fabricated and "should no longer be relied upon."  In reality, Tingo Foods had *not* generated $577.2 million in revenue or $143.5 million in profits in the 50 days from February 9, 2023 through March 31, 2023, and did *not* generate more than

49

$400 million dollars (or any money) in its first four months of existence, as Tingo Foods did not even have a real bank account during this period and its purported revenues were entirely fabricated. Additionally, the statements regarding Tingo's Nwassa platform were materially false and misleading, and omitted material facts when made, because the Nwassa platform was not operational. According to the Hindenburg Report, the Nwassa platform's website was under maintenance and had been for months during the Class Period. Indeed, archives of the platform reveal that it was *never* fully developed and listed just a few products with no reviews or ratings. As such, the revenue and GTV numbers are false and misleading because the Nwassa platform was not capable of processing transactions during the time the statements were made.

112.   Additionally, in its 1Q23 10-Q, Tingo claimed to have $780,153,000 in cash and cash equivalents, which included $680,422,200 purportedly held at Tingo Mobile, and $77,069,100 purportedly held at Tingo Foods. The 1Q23 10-Q claimed that "the majority of the cash is held at its bank in Nigeria, and there are certain foreign exchange restrictions in place that limit the conversion of such cash into US Dollars and other currencies."

113.   The statements in ¶112 were materially false and misleading, and omitted material facts when made, because as set forth in the Hindenburg Report, and subsequently confirmed by the SEC, DOJ, and Tingo's own post-Class Period

admissions, Tingo's financial statements were completely fabricated and "should no longer be relied upon." Instead, the purported revenues and other financial metrics Defendants reported in the 1Q23 10-Q were based upon falsified bank statements and a doctored general ledger. For instance, Tingo's cash and cash equivalents were materially overstated as Tingo Mobile's actual cash balance at that time was around $25 and Tingo Foods was less than $100. As reflected in its real bank statements, Tingo Foods had virtually no operations and no realized revenues or profits as of March 31, 2023.

114. Furthermore, regarding Tingo's planned food processing facility, the 8-K stated,

> Tingo Foods, together with its joint venture construction partner on the new state-of-the-art $1.6 billion food processing facility, celebrated the breaking of ground with a foundation laying ceremony attended by various representatives of local government and Nigeria's Ministry of Agriculture. ***Since then, significant progress has been made on the construction of the facility including the installation of infrastructure, drainage, water supply and the foundations of its numerous buildings***. With construction work progressing as scheduled, the new food processing facility, to be operated exclusively by Tingo Foods, is on timetable and anticipated to open by mid-2024.

115. On the conference call with analysts and investors, Defendant Mmobuosi likewise emphasized:

> Tingo Foods is set to multiply capacity and revenue with a new state-of-the-art $1.6 billion food processing facility in Delta State of Nigeria. ***Our joint venture partner is already at an advanced stage of completing work on the building's foundations and the installation of***

*infrastructure, drainage, and water supply and facility is on track to open by mid-2024.*

116.   Along those same lines, the Q1 2023 10-Q stated that, "Tingo Foods has also agreed to enter into a partnership with Evtec Energy Plc to build and operate our own food processing facility, which is expected to be completed by mid-2024."

117.   The statements in ¶¶114-116 were materially false and misleading, and omitted material facts when made, because the Company was not attempting to build its so-called "state-of-the-art" food processing facility.   As documented in the Hindenburg Report, Tingo had not begun preparing the food processing facility site for operations, let alone installed infrastructure, draining, water supply, or foundations, as the Hindenburg Report revealed that its authors "visited the site [on May 24, 2023] and found zero signs of progress; it was empty except for the plaque and billboard commemorating the groundbreaking ceremony, surrounded by weeds."   The Hindenburg Report also disclosed that during the May 24, 2023 site visit, the cinderblocks on display at the ceremony were in the exact same spot without "one single additional brick or additional site prep[,]" noting that the site "consists solely of the sign with the stock photo of the oil refinery, overgrown brush, a shipping container, and the plaque commemorating the groundbreaking":







118.    Finally, Evtec Energy Plc, Tingo Foods supposed joint venture partner, had no cash on hand and at the time was a dormant company.

119.    Accompanying Tingo's 1Q23 10-Q, which contained materially false and misleading statements as alleged above, Defendants Mercer and Chen executed certifications pursuant to SOX Section 302 attesting to the accuracy of that filing. Specifically, in their SOX certifications for the 1Q23 10-Q, Defendants Mercer and Chen attested that (1) "this report does not contain any untrue statement of a material

fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" (2) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Tingo] as of, and for, the periods presented in this report;" and (3) Defendants Mercer and Chen disclosed to Tingo's auditors and Board of Directors "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the [Company's] internal control over financial reporting."   The SOX certifications signed by Defendants Mercer and Chen also warranted, pursuant to Section 906, that the "[t]he information contained in the [1Q23 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

120.   By signing these SOX certifications, Defendants Mercer and Chen evidenced their access (and purported review of) Tingo's operations as well as the materially false and misleading statements set forth above.  However, based on the allegations set forth above, it is apparent that such a review would have uncovered the fact that many of the Company's claims about its purported assets, revenues, expenses, customers and suppliers were false.   Indeed, following the SEC's investigation, Tingo admitted that its first quarter of 2023 financial report included in the 1Q23 10-Q "should no longer be relied upon."

**F.    May 30, 2023 – Tingo DMCC Press Release**

121.    On May 30, 2023, Tingo issued a press release announcing that Tingo DMCC "has completed its first batch of export deals, generating $348 million of sales with a gross profit approaching $100 million." The press release added that "[t]he sales completed today are part of an anticipated long-term multi-billion-dollar pipeline of export transactions, more than $1 billion of which are currently being processed for expected delivery by the third quarter of 2023."

122.    The statements in ¶121 were materially false and misleading, and omitted material facts when made, because Tingo fabricated the export data it reported.  According to the Hindenburg Report, Nigerian customs data do not contain any records of Tingo or Tingo DMCC exports, let alone in the amount of $348 million.  Further, Tingo claimed to be actively processing more than $1 billion in export transactions, yet Nigeria's entire total agricultural exports in 2022 were $1.15 billion.

123.    Overall, since December 1, 2022, Tingo Mobile's fictitious transactions and records have been incorporated into the books and records of Tingo and reported in its publicly disclosed financial statements, while Tingo Foods' fictitious transactions and records have been incorporated into the books and records of Tingo and reported in its publicly disclosed financial statements since February 2023.

## VI.   ADDITIONAL ALLEGATIONS OF SCIENTER

124.   As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning Tingo's business, operations, and prospects were materially misleading and/or lacked a reasonable basis when made.   In addition to the allegations set forth above, these particularized facts include the following:

125.   *First*, Tingo is legally responsible for the conduct of the Individual Defendants as they served as officers of the Company during the Class Period.   Tingo acted with scienter because the knowledge of its most-senior executives, which includes each of the Individual Defendants, is imputed to Tingo.   Indeed, the cumulative knowledge of all members of Tingo's management team regarding these matters is properly imputed to the corporate defendant—the Company.   And the Individual Defendants indisputably knew that Tingo's financial disclosures were fraudulent.

126.   Indeed, during the Class Period, Defendant Mercer served as CEO of the Company and Defendant Chen served as CFO.   Defendant Mmobuosi founded both Tingo Mobile and Tingo Foods and was the main controller of their business operations at all relevant times.   Thus, Defendants Mmobuosi, Mercer, and Chen, serving as executive officers of Tingo, controlled the day-to-day operations of the Company.

127. Given their positions, these officers must have known that the financial information they provided to Tingo's auditors was falsified. As the Company's most-senior executives, Defendants had access to all of the Company's documents, including Tingo's true bank account statements.

128. For example, Tingo's 2022 10-K filed in March 2023 reported a cash and cash equivalent balance of $461.7 million residing in Tingo Mobile's Nigerian bank accounts. In reality, however, the SEC's investigation found that authentic bank records for the same accounts show a balance of less than $50 for that period.

129. Additionally, under Defendant Mmobuosi's direction, Tingo Foods produced fictitious operating bank account statements, which show that between September 1 and December 31, 2022—the first four months of the Tingo Foods purported operations—Tingo Foods received deposits around $556 million, made withdrawals of around $503 million, and carried a cash balance of around $54 million as of year-end 2022. In reality, as the SEC's investigation revealed, Tingo Foods' actual bank statements produced by the bank itself—which bear the exact same account number as the fictitious bank statements Tingo Foods provided its auditors and investors—show that Tingo Foods did not even open its operating bank account until February 2023. And from March through September 2023, Tingo Foods had maintained a balance of around about $100, and, as of September 15, 2023, had only ever made three transactions, withdrawing a total of about $20.

130.   Finally, Defendant Mmobuosi signed each of the full-year auditor statements, and each statement also contained an independent audit report bearing the signature of a supposedly chartered accountant.  However, the SEC found that certain of these purportedly audited financial statements were not audited or reviewed by any auditing firm, and the auditor's signature was a forgery.

131.   Given their access to these documents and their personal involvement in the preparation and execution of Tingo's audited financial statements during the Class Period, the Individual Defendants must have known that the Company's purported audited financial statements were fabricated and contained forged signatures of nonexistent auditors.  The Individual Defendants' scienter, as detailed herein, is indisputably imputed to the Company.

132.   *Second*, Tingo was not meaningfully engaged in many of the business activities, such as food processing and mobile technology, that it claimed would drive future growth.  Defendants created fake financial statements and forged supporting material to falsely portray Tingo Mobile and Tingo Foods as thriving and profitable businesses with hundreds of millions of annual revenue, profit and available cash.  However, Defendants must have known that these disclosures were fraudulent because Defendants claimed to be generating that revenue pursuant to contracts with counterparties they knew did not exist.  For instance, the SEC confirmed that Defendants concealed their fraud by buying and registering internet

domain names in the names of made-up suppliers and customers and using these fake email addresses to provide false confirmations to Tingo's auditors.

133.  In addition, Tingo Mobile's fake bank statements and fraudulent general ledger—provided to its auditors—reflect over $1.5 billion in payments to UGC between January 2021 and May 2023, including over $750 million in 2022 alone.  However, Tingo Mobile's actual bank statements show that Tingo Mobile has never made a single payment to any "UGC," under any of these names or any other variant of it.  The SEC's investigation found that Tingo Mobile executives created fake and backdated purchase agreements with UGC.  Defendants also created and sent false invoices, delivery notes and remittance advices to auditors and others to substantiate these purported payments to UGC—which, as noted, did not appear anywhere in Tingo Mobile's authentic, actual bank statements.

134.  The fictitious bank statements and ledgers Tingo Mobile provided to Tingo's auditors reported several sizeable handset sales and leasing payments from two supposed cooperatives in Africa between 2021 and 2023.  However, SEC discovered that these figures, likewise, reflect a marked discrepancy from the payments reported from these cooperatives in Tingo Mobile's actual bank statements, which show that Tingo Mobile has never received any payments from either of the reported farming cooperatives.

135.    Furthermore, Tingo Mobile employees told Tingo's auditors that revenues from its customers' use of the Nwassa platform were received, processed and recorded in its bank statements through its payment gateway, "Paystack." Indeed, Tingo's fictitious bank statements and general ledger provided to the SEC reflect Tingo's receipt of about $245 million from "Internal Transfers – Paystack" during 2021 and $641 million from "Paystack Airtel" during 2022, supposedly reflecting income earned from its Nwassa business. In reality, though, Tingo's actual bank statements do not reflect any payments received from Paystack or Paystack Airtel.

136.    As a result, throughout the Class Period, Defendants must have known that they had massively overstated Tingo's reported sales, earnings and assets in the Company's publicly-disclosed financial statements for each reporting period in which it owned Tingo Mobile or Tingo Foods.

137.    *Third*, substantially all of the Company's purported revenue during the Class Period was derived from Tingo Mobile and Tingo Foods; accordingly, there is no question that Defendants were well aware that Tingo's core businesses were really sham companies. Tingo Mobile and Tingo Foods were the Company's main revenue generating segments during the Class Period and Defendants repeatedly commented on the significance of acquiring Tingo Mobile and Tingo Foods for Tingo's growth and future profitability. For instance, the 1Q23 10-Q reported that

of the $851,245,000 in revenues the Company received in the quarter, $830,685,000, or nearly 98%, were from Tingo Mobile's customer's smartphones and Nwassa platform usage, as well as from Tingo Food's purported food processing contracts. Moreover, as the Hindenburg Report and SEC and DOJ's investigations revealed, the fraud was on an incredibly widespread and "staggering" scale, infecting the entire Company's operations.

138.   In light of these facts, it is inconceivable that the Defendants did not know the facts and circumstances of the fraud as alleged herein.  Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Defendants' roles and status within Tingo, and the litany of facts regarding their personal involvement in the key events and circumstances at issue, as alleged herein, supporting a finding of Defendants' scienter.

139.   *Fourth*, Defendants' admissions following the SEC complaint and DOJ indictment that their financial statements "should not be relied upon[,]" raises a strong inference of scienter.  Accompanying Tingo's 2022 10-K and 1Q23 10-Q filings, which contained materially false and misleading statements as alleged above, Defendants Mercer and Chen executed certifications pursuant SOX Section 302 attesting to the accuracy of the filing.  Specifically, in their SOX certifications for the 2022 10-K and 1Q23 10-Q, Defendants Mercer and Chen attested that (1) "th[e] report[s] do[] not contain any untrue statement of a material fact or omit to state a

material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report[s];" (2) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Tingo] as of, and for, the periods presented in this report;" and (3) Defendants Mercer and Chen disclosed to Tingo's auditors and Board of Directors "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the [Company's] internal control over financial reporting."   The SOX certifications signed by Defendants Mercer and Chen also warranted, pursuant to Section 906, that the "[t]he information contained in the [2022 10-K and 1Q23 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

140.   By signing these SOX certifications, Defendants Mercer and Chen evidenced their access (and purported review of) Tingo's operations as well as the materially false and misleading statements set forth above.  However, based on the allegations set forth above, it is apparent that such a review would have uncovered the fact that many of the Company's claims about its purported assets, revenues, expenses, customers and suppliers were false.

141.   In an 8-K filed on December 26, 2023, Defendant's finally admitted that their 2022 year-end and first quarter 2023 financial statements "should no longer

be relied upon." By admitting the unreliability of these financial reports, Defendants implicitly acknowledged that their statements made in its 2022 10-K and 1Q23 10-Q were knowingly false and misleading. Had Defendants Mercer and Chen actually conducted the assessments and evaluations required by SOX, they would have discovered Tingo's misrepresentations and omissions regarding its reported revenues, expenses, and assets. Accordingly, Defendants Mercer and Chen knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

142. *Fifth*, Defendant Mmobuosi is reaping illicit profits from the fraud through the looting of corporate assets and is currently a fugitive. The SEC's complaint notes that Defendant Mmobuosi "has also exploited his control status to loot Tingo Group assets (i.e., legacy assets from operating subsidiaries of the pre-merger predecessor companies still residing at Tingo Group)." For instance, in December 2022, Defendant Mmobuosi used Tingo Mobile's exaggerated relationship with Bullitt to misappropriate assets from Tingo, obtaining approval of a $10 million inter-company loan to Tingo Mobile for "funding costs relating to the purchase of smartphone handsets from its supplier, [Bullitt]." Mmobuosi then directed that the $10 million paid to him personally (or to other individuals for his benefit) through an attorney trust account, claiming that he had personally prepaid Bullitt the $10 million balance, and was thus owed the $10 million in inter-company

loan proceeds received by Tingo Mobile.  But, as the SEC realized, Bullitt had never received this $10 million from any source.

143.   In addition, the SEC's investigation revealed further evidence that before, and during the Class Period, at least an additional $16 million has been siphoned from Tingo's accounts, and transferred to Defendant Mmobuosi's personal accounts, with no explanation, which Defendant Mmobuosi has used for his personal benefit, including purchases of luxury cars, travel on private jets, as well as an unsuccessful attempt to acquire an English Football Club Premier League team, among other things.  In addition, as the DOJ and FBI's press release mentions, Defendant Mmobuosi is missing, and is considered "at large."

144.   In sum, the vast majority of Tingo's reported revenues, expenses, assets, and business operations are fictitious.  Defendants knew, or were reckless in not knowing, that recording the results from fabricated businesses onto Tingo's books and records, and concealing this fraud from Tingo's auditors, would result in Tingo's filings with the SEC and otherwise publicly disseminating materially misstated financial statements.  Defendants also knowingly, or recklessly, amplified those material misrepresentations by repeating them personally to investors during Tingo's quarterly earnings calls.

145.   The foregoing facts, particularly when considered collectively and in the light most favorable to Lead Plaintiffs (as they must be), support a strong inference of Defendants' scienter.

## VII.  LOSS CAUSATION

146.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Tingo shares and operated as a fraud or deceit on Class Period purchasers of Tingo shares by failing to disclose and misrepresenting the adverse facts detailed herein, including that: (1) Tingo routinely overstated its revenue and other accounting metrics, creating a false impression of the Company's finances (2) Tingo was not meaningfully engaged in many of the business activities that it claimed had been profitable and would continue to drive future growth; (3) many of the Company's supposed contracts with customers and suppliers did not exist.

147.   As a result of their purchases of Tingo shares during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.  Defendants' materially false and misleading statements caused Tingo shares to trade at artificially inflated levels throughout the Class Period, reaching as high as $5.32 per share on May 19, 2023.

148.   By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Tingo's business and the value of

Tingo securities. As true facts about the Company were revealed to the market, the price of Tingo securities declined significantly. This decline removed the inflation from the price of Tingo securities, causing real economic loss to investors who had purchased or acquired Tingo securities during the Class Period.

149. The decline in the price of Tingo securities after the corrective disclosure came to light was a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Tingo shares negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

150. The economic loss, i.e., damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Tingo shares and the subsequent significant decline in the value of Tingo when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII. PRESUMPTION OF RELIANCE

151. At all relevant times, the market for Tingo securities was an efficient market for the following reasons, among others:

> (a)  Tingo met the requirements for listing and its shares were listed and actively traded on the NASDAQ, a highly efficient and automated market;
>
> (b)  Tingo filed periodic public reports with the SEC and the NASDAQ;
>
> (c)  Tingo regularly publicly communicated with investors via established market-communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
> (d)  Tingo was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

152.   As a result of the foregoing, the market for Tingo securities promptly digested current information regarding Tingo from all publicly available sources and reflected that information in the price of Tingo securities.   Under these circumstances, all purchasers of Tingo shares during the Class Period suffered similar injury through their purchase of Tingo shares at artificially inflated prices, and the presumption of reliance applies.

153.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material misstatements and omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Tingo—information that

Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. As alleged above, that requirement is satisfied here.

## IX.    THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS

154.    The statements alleged herein to be materially false and misleading are not subject to the protections of the PSLRA's statutory Safe Harbor for forward-looking statements because (a) they are not forward looking; (b) they are subject to exclusion; or (c) even if purportedly forward-looking, Defendants cannot meet the requirements for invoking the protection, i.e., identifying the statements as forward looking and demonstrating that the statements were accompanied by meaningful cautionary language.

155.    Many of the statements were misleading in light of omissions of material present or historical facts and cannot be considered forward-looking.

156.    Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statement is protected if it is identified as such and "accompanied by meaningful cautionary language." 15 U.S.C. § 78u-5(c)(1)(A)(i). An oral forward-looking statement must be accompanied by a cautionary statement that it is forward-looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written

document.  In addition, the oral statement must: (i) identify the written document, or portion thereof, that contains such factors; and (ii) the referenced written documents must contain meaningful cautionary language. 15 U.S.C. § 78u-5(c)(2)(B).

157.  The Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K. 15 U.S.C. § 78u-5(b)(2)(A).

158.  Statements of historical fact, current condition or a mixture thereof are not "forward-looking" and thus not protected by the Safe Harbor.

159.  To the extent any of the statements were identified as forward-looking statements, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  A warning that identifies a potential risk, but implies that such a risk had not materialized, i.e., states that something might occur but does not state that something actually has already occurred, is not meaningful and does not fall within the protections of the Safe Harbor.

160.  Defendants' forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis.  Defendants are liable for those false forward-looking statements because, at the time each of

those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Tingo, who knew that those statements were false or misleading when made.

## X.    CLASS ACTION ALLEGATIONS

161.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Tingo securities from December 1, 2022 through June 5, 2023, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; Tingo's subsidiaries and affiliates; any person who is or was an officer or director of Tingo during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

162.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Tingo shares actively traded on the NASDAQ and the 1Q23 10-Q states that there were more than 163 million shares of Tingo shares outstanding as of May 12, 2023. While the exact number of Class members is unknown at this time, and can only be

ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tingo, its transfer agent, or its depository Company and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163. Common questions of law and fact predominate and include:

(a) whether Defendants violated the Exchange Act and SEC Rule 10b-5;

(b) whether Defendants omitted and/or misrepresented material facts;

(c) whether Defendants knew or recklessly disregarded that their statements were false;

(d) whether Defendants' statements and/or omissions artificially inflated the price of Tingo shares; and

(e) the extent and appropriate measure of damages.

164. Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

165. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

166.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    COUNTS

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

167.   Lead Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

168.   This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

169.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72

170.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Tingo shares during the Class Period.

171.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tingo shares. Lead Plaintiffs and the Class would not have purchased Tingo shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

172.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Tingo shares during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

173.    Lead Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

174.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

175.    During the Class Period, the Individual Defendants acted as controlling persons of Tingo within the meaning of Section 20(a) of the Exchange Act.

176.    During their tenures as officers and/or directors of Tingo, each of Defendants Mmobuosi, Mercer and Chen was a controlling person of Tingo within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Tingo, the Individual Defendants had the power and authority to cause Tingo to engage in the wrongful conduct complained of herein.  The Individual Defendants were able to and did control, directly and indirectly, the content of statements alleged as false and misleading described herein made by Tingo during the Class Period.

177.    In their capacities as senior corporate officers and/or directors of Tingo, and as more fully described above, the Individual Defendants participated in the misstatements and omissions set forth above.  Indeed, the Individual Defendants had unlimited access to Tingo's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause them to be corrected.  As a result of the foregoing, Defendants

Mmobuosi, Mercer, and Chen were control persons within the meaning of Section 20(a) of the Exchange Act.

178. Further, as detailed above, Tingo violated Section 10(b) of the Exchange Act by their acts and omissions as alleged in this Complaint. During the respective times Defendants Mmobuosi, Mercer, and Chen served as officers Tingo, they are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Tingo is liable under Section 10(b).

179. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII. PRAYER FOR RELIEF

180. WHEREFORE, Lead Plaintiffs pray for judgment as follows:

(a) Determining that this action is a proper class action, certifying Lead Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class counsel;

(b) Awarding Lead Plaintiffs' reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

(c) Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

181. Lead Plaintiffs demand a trial by jury.

Dated:  September 20, 2024                 Respectfully submitted,

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**

By: /s/ *James E. Cecchi*
James E. Cecchi
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*

**SAXENA WHITE P.A.**

Steven B. Singer (*pro hac vice* forthcoming)
Sara DiLeo (*pro hac vice*)
Marco A. Dueñas (*pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ssinger@saxenawhite.com
sdileo@saxenawhite.com
mduenas@saxenawhite.com

-and-

Scott M. Koren (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
skoren@saxenawhite.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

76

**THE SCHALL LAW FIRM**

Brian Schall (*pro hac vice* forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel.: (310) 301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiffs*